In re Interest of Nicole M., a child
under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v. Brandy S., appellant, and Thomas M.,
appellee and cross-appellant.

In re Interest of Sandra M., a child
under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v. Brandy S., appellant, and Thomas M.,
appellee and cross-appellant.

___ N.W.2d ___

Filed March 21, 2014.    Nos. S-13-354, S-13-355.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Proof.** Under Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination in is the child's best interests.

3. **Constitutional Law: Parental Rights.** The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.

4. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; as such, before a court may terminate parental rights, the State must also show that the parent is unfit.

5. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit.

6. **Parental Rights: Statutes: Words and Phrases.** The term "unfitness" is not expressly used in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests.

7. **Constitutional Law: Parental Rights: Courts: Words and Phrases.** In discussing the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has stated parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being.

8. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

9. **Parental Rights: Proof.** The fact that a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness. Instead, the placement of a child outside the home for 15 or more the most recent 22 months under Neb. Rev. Stat. § 43-292(7) (Cum. Supp. 2012) merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness.

10. ____: ____. Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.

11. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

Appeals from the County Court for Buffalo County: Graten D. Beavers, Judge. Affirmed in part, and in part reversed.

Stephen G. Lowe for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee State of Nebraska.

John M. Jensen, of Yeagley, Swanson & Murray, L.L.C., for appellee Thomas M.

Michele J. Romero, of Stamm, Romero & Associates, P.C., L.L.O., guardian ad litem for children.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Heavican, C.J.

## I. INTRODUCTION

The county court for Buffalo County, sitting as a juvenile court, terminated the parental rights of Thomas M. (Tom) and Brandy S. to their children Nicole M. and Sandra M. Brandy appeals, and Tom cross-appeals. We affirm in part, and in part reverse.

## II. FACTUAL BACKGROUND

Tom and Brandy are the biological parents of Nicole, born in October 2004, and Sandra, born in January 2006. Tom

is employed as a maintenance worker at a trailer court in Kearney, Nebraska, where he, Brandy, and the children live. Brandy is sporadically employed and has recently worked as a hotel housekeeper and in the fast-food industry. Tom and Brandy are not married.

### 1. Events Leading to Adjudication

On March 28, 2011, Nicole and Sandra were removed from the family home due to its unsanitary condition. As early as July 2008, law enforcement had investigated the family due to similar allegations, as well as to injuries sustained by Nicole. Voluntary services had been provided to the family prior to the children's removal.

A petition to adjudicate was filed on March 29, 2011, and the children were adjudicated on April 6. The children were moved to a foster placement.

### 2. Adjustment to Foster Home and Reports of Prior Abuse

Upon entering the foster home, the children reportedly suffered from nightmares, bed-wetting, recurrent head lice, and poor hygiene practices.

Initially, the children's foster parents encouraged an open relationship with Tom and Brandy. But that openness ended when Brandy began having trouble with boundaries. Even after being instructed to stop contacting the foster mother, Brandy continued to do so.

While in the foster home, further details of Nicole's and Sandra's lives were revealed. First, Nicole told her foster mother that her home was unsafe and that Tom and Brandy fought a lot. Nicole also told her foster mother that Brandy made verbal threats against them. Most notably, according to Nicole, Brandy had threatened to stab the children while they slept. The children's foster mother also testified that the children told her Brandy physically abused them. Information from the foster mother states that in May 2012, Nicole told her that "'Mommy is nice if people are around but when she gets us alone she is mean.'"

In addition, the children told their foster mother that they had both been sexually assaulted by a friend of Brandy's.

Brandy informed the children's therapist, Pamela Trantham, of this abuse. Upon further investigation, the person accused admitted the allegations and has since been convicted of third degree sexual assault of a child. It was also suggested that Tom and Brandy were aware of the assaults but did not report them to law enforcement because they did not wish the children to have to testify against the perpetrator.

In addition to Brandy's being aware of the allegations, there is some evidence in the record to suggest that Brandy took the children to the jail to visit the perpetrator after becoming aware of the abuse.

### 3. Visitation

For most of the children's time in out-of-home placement, there has been supervised visitation with Tom and Brandy. There was a brief period of semisupervised or unsupervised visitation in the summer of 2011. There were reports that during that period of time, each of the children experienced issues with hygiene, including dirty clothes, face, and hair, and not having a toothbrush or brushing their teeth for an entire weekend visitation.

More significantly, Nicole reported that during this unsupervised visitation, Brandy physically abused the children. Nicole further reported that Brandy told her not to tell anyone about the abuse or the children would not get to go home. According to Trantham, Nicole indicated that Tom and Brandy would get into fights during visitation. This allegation was confirmed in at least one instance by the family support worker.

Tom and Brandy denied that abuse was occurring at visitation. Tom testified that he did not see any fear on the part of the children during unsupervised visitation and that the children appeared to not want to leave visitation.

The children's foster mother testified that she noticed a high level of anxiety and fighting between the children around the time of visitation with Tom and Brandy and that it took a few days to get the children back into a routine after a visit.

Notwithstanding the abuse allegations, the children were generally happy to see Tom and Brandy during visitation and the visits were largely harmonious. However, there were issues.

For example, the family support worker reported that Brandy left dirty dishes in the sink with the expectation that Nicole and Sandra would wash them during their visit. There was also evidence that Brandy was not always interested in parenting during her visitation with the children. One family support worker testified that Brandy "often put her other friends and relatives ahead of her visits" with the children.

### 4. Nicole's Counseling

After the children's removal, both began counseling with Trantham. Nicole had been diagnosed with posttraumatic stress disorder and adjustment disorder. Initially, Nicole made progress with her counseling. But in March 2012, Brandy, who had been transporting the children to their therapy appointments, began pressuring Nicole to ask for resumption of unsupervised visitation. This caused Nicole to disassociate, including experiencing problems sleeping, impaired concentration, and auditory hallucinations telling her to harm her foster mother.

During Nicole's therapy, she also expressed fear over being alone with Brandy and was generally an anxious child. Nicole did have some issues with lying, although Trantham indicated that she was not concerned with this issue, given Nicole's age. Nicole was eventually medicated to help control her anxiety and other symptoms.

Trantham testified that Nicole was very intelligent, presented much older than her age, and exhibited much responsibility for Sandra. Trantham reported that Nicole understood how the foster care and court processes worked, including the roles of the various individuals involved.

According to Trantham, Nicole reported during her therapy sessions that Brandy had physically abused her when she and Sandra lived at home as well as during visitation. Nicole reported that, generally, when the abuse occurred, Tom would tell Brandy to stop. There is at least some evidence in the record that Nicole also reported Tom would pull her hair, though details of this allegation are not clear.

The record includes a letter written by Nicole to her guardian ad litem requesting that she not be made to see Brandy

in an unsupervised setting. But while Nicole did not wish to see Brandy in an unsupervised setting, Trantham reported that Nicole suffered from guilt as a result of her reporting the visitation abuse, because Nicole loved Tom and Brandy and wanted to see them.

Trantham also testified about Nicole's fear of Brandy and of returning home. According to Trantham and others, Nicole feared that Brandy would sneak into her bedroom at her foster home and hurt her. This issue was alleviated when her foster father placed "'special tape'" over the window, which he explained would keep her safe.

### 5. Sandra's Therapy

Sandra also engaged in therapy. She was diagnosed with an adjustment disorder, and according to Trantham, she might also have "reactive attachment" disorder. Sandra did not progress in therapy as well as Nicole did.

Trantham testified that Sandra had anger issues, as well as trust issues, with adults. This seemed to be reflected in her relationship with her foster mother, who often seemed to bear the brunt of Sandra's anger. But on other occasions, Sandra seemed to make strides in her relationship with her foster mother and with Trantham. Toward the end of one of her counseling sessions, Sandra asked her foster mother what she, Sandra, had done wrong to prevent her from going home. According to Trantham's notes, during that session, Sandra was reassured that it was not her fault and Sandra "was able to identify that her 'mom and dad never came back,'" presumably referring to the fact that Tom and Brandy had not done what was necessary to reunify the family.

### 6. Recommendations Regarding Family Therapy and Reunification

Trantham indicated that she would not recommend family therapy for Tom, Brandy, and the children, because

> when you have a situation where you have a victim and a perpetrator of any type of abuse, you do not put those two together until the perpetrator has experienced some sort of treatment. And that should generally mean that [he or

she can] accept responsibility for [his or her] role and that [the perpetrator] can demonstrate some remorse.

Now, if you do that before those goals have been met, then the bulk of the responsibility shifts right back to the victim. And you run the risk of further marginalizing and victimizing that child or battered woman or whoever the case may be.

Trantham believed, based upon her interactions with Tom and Brandy at team meetings, and based upon conversations with Brandy's former therapist, that neither Tom nor Brandy had taken responsibility sufficient to proceed to family therapy.

Brandy's initial therapist, Amy Eigenberg, also testified that as of the time that Brandy stopped seeing her, Eigenberg would not yet have recommended family therapy. One of the main reasons for this lack of recommendation was Brandy's failure to take responsibility for hitting Nicole during unsupervised visitation.

But Kathleen White, Brandy's most recent therapist, testified that she believed family therapy should be attempted and that one should determine why the children were not ready and "attempt to make them ready." White indicated that she would support family therapy even if the children's fear was initially caused by the parent. White acknowledged, however, that she had not communicated with Trantham regarding the children's therapy. When asked, White also admitted that she would not perform couples' therapy with a domestic violence victim where the abuser had not taken responsibility for the abuse.

Trantham testified that reunification, up to that point, had not been possible; that she felt it was in the children's best interests not to return to Tom and Brandy's home; and that instead, Tom's and Brandy's parental rights should be terminated. Trantham did testify, however, she felt that even post-termination, there should be contact between Tom, Brandy, and the children.

## 7. Brandy's Counseling

Brandy also attended counseling. Initially, Brandy voluntarily underwent therapy with Eigenberg beginning on

February 15, 2010. When Brandy began counseling with Eigenberg, on the Department of Health and Human Services' recommendation, her treatment plan was twofold: to undergo outpatient counseling once a week and to seek a medication assessment. During Brandy's initial assessment, she admitted to Eigenberg that she had threatened her children with a knife and would slap them when she got angry. Eigenberg testified that later, Brandy would "kind of retract back and not want to admit it and the idea of getting into trouble if she admitted to things."

According to Eigenberg, Brandy attended only eight sessions, with her last appointment on May 14, 2010. Eigenberg testified that Brandy was not consistent in attending her counseling appointments and did not meet her treatment goals. Eigenberg also testified that she had concerns about Brandy's motivation to change and opined that she thought Brandy only wanted others to "feel like she's doing a good job rather than . . . really wanting to do the . . . good job to make those long changes."

On June 9, 2011, Brandy returned to Eigenberg, this time for department-mandated counseling following the removal of Nicole and Sandra from the home. Though Brandy initially attended counseling, she stopped fairly soon thereafter and her caseworker was informed of her noncompliance. After her caseworker was informed, Brandy attended her appointments consistently.

During this time, Brandy also underwent psychological testing. Brandy was diagnosed with a mood disorder, not otherwise specified, and additionally was found to have borderline intellectual functioning, such that "she may have difficulty understanding and following through on directives given to her." Brandy's testing indicated that "Brandy has sufficient mood variability of both depressive and hypomanic symptoms to be problematic, but not sufficient for a full diagnosis of bi-polar disorder." Tom Maxson, the therapist who conducted Brandy's testing, testified that Brandy's diagnosis was a "step-down diagnosis from a bipolar disorder." Maxson testified that for Brandy, medication was "essential."

Brandy's profile also suggested that

> she likely [is] indifferen[t] to the welfare of others and
> . . . may be exploitative . . . . Malicious tendencies seen
> in others may be used to justify her aggressive inclina-
> tions and may lead to frequent personal and family dif-
> ficulties and occasional legal entanglements. . . . Brandy
> likely is envious of others and may feel that she is treated
> unfairly yielding to irritability and anger. She may obtain
> vindictive gratification from humiliating others. A guiding
> princip[le] for Brandy may be to outwit others, exploiting
> them before they exploit her. . . . If she is unsuccessful
> in channeling her suspicious and aggressive impulses,
> her resentment may mount into acts of potential abuse
> and hostility. Brandy is likely to display rapidly chang-
> ing moods and have outbursts of bitter resentment and
> demanding irritability.

The report continues:

> The primary concern for Brandy, especially in rela-
> tion to her children, is her personality patterns. Brandy
> appears to exhibit[] patterns of behavior that result in
> dangerous situations for her children. Brandy's dependent
> traits make her reliant on others to help her make deci-
> sions and her borderline traits make her prone to feeling
> abandoned and rejected. When she feels rejected and
> alone, she resorts to methods of controlling the situa-
> tion around her to get her needs met. In the recent past it
> appears that in order to control the father of her children,
> Tom, she was [sic] resorted to threatening behavior or
> in her words "taking it out on" her daughters in order to
> hurt Tom for making her feel rejected. . . . Most likely,
> when Brandy feels rejected she feels the desire to make
> Tom hurt like she hurts, therefore, she "takes it out" on
> her children because this is the most effective way to
> make him hurt. . . . Most likely, when Brandy is very
> angry or feeling abandoned, in her mind her children
> become objects to get her needs met and not children to
> be nurtured and protected. . . . Her current medication has
> reduced some of this anger and depression, but without

consistent accountability and supervision, her behavioral patterns will likely return . . . .

Eigenberg testified that Brandy attended her appointments and at first seemed motivated. But Eigenberg would later find that Brandy was "not honest," which interfered with her progress. In particular, Eigenberg testified that Brandy had trouble accepting responsibility for what had happened to the children. Eigenberg indicated that at first, Brandy was able to acknowledge some of her antisocial and sadistic thinking, but that later, Brandy became "guarded" and "much more focused on what she needed to show the team that she was . . . working hard or doing things . . . than really actually doing the work to make those changes."

Eigenberg testified to several examples of Brandy's lack of honesty. First, Eigenberg noted that Brandy consistently informed her and the team that she was taking her medications, when in fact she was not. In addition, Brandy was not truthful with Eigenberg concerning how often she was seeing her doctor regarding that medication. Eigenberg also testified that Brandy did not prioritize her need for medication, using her money to buy other items instead of paying for her medication.

Brandy also initially denied that she had encouraged Nicole to speak to Trantham about reinstating the unsupervised visitation and did not admit to Eigenberg that she had done so until Brandy was confronted with notes from the team meeting where this incident was documented. And Brandy would often inform Eigenberg that things were going well, only for Eigenberg to later learn from members of the team that this was not the case.

Eigenberg testified that during her second round of treatment with Brandy, Eigenberg felt that Brandy had not met her treatment goals, though she also testified that Brandy had made some progress. At this point, Brandy switched therapists.

After ceasing therapy with Eigenberg, Brandy began to see White. White testified that she had spoken with Eigenberg about Brandy and had unsuccessfully attempted to contact both Trantham and Brandy's psychiatrist. She testified that she had not contacted Tom's therapist.

White indicated that she spoke with Brandy about the importance of Brandy's being open and honest. According to White, as far as she knew, Brandy had been honest in their therapy relationship, had attended consistently, and was progressing.

On further examination, however, White acknowledged that while she was aware of Brandy's knowledge of the sexual assault perpetrated on the children, White was not aware Brandy had visited the perpetrator in jail on various occasions, and that she was aware of certain abuse allegations against Brandy only because either Eigenberg told her or they were documented. White also testified that as far as she knew, Brandy had been compliant with her medication. But White acknowledged that she was relying on Brandy's self-reporting for this belief.

White testified she felt that Brandy could, with assistance, raise her children, and should be given more time to proceed with the case plan.

In addition to testimony from Brandy's therapists, Tom testified that in the time just prior to trial, Brandy's medication compliance had improved. He testified that he was not actually observing Brandy take her medication. Tom testified that he felt Brandy was doing much better because of the medication. Other witnesses echoed the belief that Brandy had changed.

Brandy testified that she was taking her medication "[r]ight in front of" Tom so that he could observe her doing so. Brandy explicitly admitted both slapping and spanking the children, but testified that she would not do so again.

### 8. Tom's Counseling and Brandy and Tom's Couples' Counseling

Tom also underwent counseling. He was originally evaluated in November 2011 and was diagnosed with an adjustment disorder with a depressed mood, most likely due to the children's removal from the home. In addition, Tom's results indicate that his full-scale IQ is in the below-average/borderline range, which "would suggest that Tom will have some difficulty with understanding multistep directions and complicated instruction.

It will be important to double check that Tom has a clear understanding of what is expected of him prior to making the assumption that he understands."

Maxson, who also performed Tom's testing, testified that Tom's "day-to-day functioning was really quite adequate. He got up everyday, he'd go to work . . . . He made sure bills were paid, he came home. . . . [H]e was doing all the basic daily living skills." Maxson had no concerns about Tom's ability to function, but indicated that "it would be difficult for him to be on his own with his kids. . . . I would have some reservations and I would say that he would need a fair amount of support . . . ."

Tom's profile further indicates:

> Throughout Tom's first marriage and now his relationship with Brandy, he tends to be a "victim" of his mate's behaviors. He allowed his first wife to verbally and physically abuse him and then allowed Brandy to verbally abuse his daughters. Tom admits that he is frequently the target of the anger of others. Tom stayed in the situation because he questioned if he could raise the girls on his own, but also stayed because he has ongoing unresolved grief about his separation from and eventual death of his first wife. In addition to relationship concerns with his wife and now with Brandy, Tom continues to have an estranged relationship with his brother. . . . All of these broken relationships seem to indicate a concerning pattern of lack of interpersonal relationship skills. Though Tom's borderline intelligence score may account for some of his confidence concerns as well as impact his ability to quickly negotiate the intricacies of interpersonal relationships, it does not account for all of the concern. Tom's general view of himself, ability to set and maintain boundaries, and low self[-]confidence in his own abilities are a much larger concern.
>
> When considering the reunification process, there are many factors that must be considered. First and foremost is an assurance that the verbal abuse, threats and alleged physical abuse must be stopped. This will most likely come from the girls' self[-]report. Tom denies

witnessing any physical abuse, but it is unclear what he would consider "physical abuse" and at what point he would actually intervene. Next, Tom needs to develop a clear safety plan as to what he will do if Brandy becomes verbally aggressive. This would include the immediate plan (getting the girls out of the situation), an intermediate plan (who to talk to and how to intervene) and a long term plan (if things don't change, what are the options). Tom needs to also develop the skills and abilities to gain confidence that he can be on his own and/or set appropriate boundaries so problematic behaviors are less likely to occur.

Maxson testified that unless Tom could make changes to his "victim behavior," Tom's pattern of behavior would continue and he would not be able to protect the children from Brandy.

Tom underwent counseling with Sarah Hock beginning in January 2012. In addition to individual therapy, Tom and Brandy also engaged in couples' therapy with Hock beginning in April 2012.

Hock testified that Tom's individual treatment goals were to work on formulating a plan for change: "taking accountability for his own roles in why the children were removed and identifying . . . a safety plan." Hock testified that she had some concerns about Tom's ability to be honest with her and to give truthful information for his treatment to work. Hock indicated that Tom would inform her that things were going well, but she would later learn from other members of the team that such was not necessarily the case. But Hock had no concerns about Tom's harming the children.

Hock testified that Tom was consistent in his attendance and that his motivation in regaining his children has remained the same. Hock also testified that while Tom had insight into what needed to be done, "the follow-through has not been there." Overall, Hock believed that Tom had made progress toward his treatment goals, but had not met them.

### 9. Case Plan Progression

Kelly Cheloha, the parties' most recent caseworker, testified that reunification was not recommended. And Christina

Ledesma, another caseworker, indicated that there had been minor and slow progression on the case plan for both Tom and Brandy.

According to Ledesma, in the beginning, Brandy would report that she was attending counseling, seeing her psychiatrist regarding medications, and taking those medications. In fact, she was often doing none of those things. Eventually, Brandy was able to attend counseling on a fairly consistent basis. But even though she was attending therapy, Ledesma testified that Brandy was not able to meet her therapy goals. This was echoed by Cheloha.

The initial reason for the children's removal was Tom and Brandy's dirty home. In the beginning, keeping it clean was an issue. By the time of trial, the unsanitary condition of the home was not much of an issue, though the kitchen was still occasionally a concern.

Brandy was also supposed to work on her parenting skills by learning and demonstrating rules, consequences, rewards, and routines for the children. Both Tom and Brandy completed several parenting courses, though not without some trouble retaining and repeating the information conveyed. Ledesma reported that there was some progress made on this front, though redirection was still common during Brandy's visits with the children.

Ledesma's primary concern was Brandy's lack of progression with her medication and therapy. Such progression would have helped to return Tom and Brandy to semisupervised visitation. But Ledesma also expressed concern because Nicole in particular was very afraid of any unsupervised time with Brandy. And, of course, Nicole's report of continued physical abuse contributed to Ledesma's opinion.

As for Tom, according to a family support worker, he was able to provide proper parenting upon occasion, but not consistently. Ledesma described Tom as "pretty laid back" and stated that it took him awhile to show that he could be consistent with rules and consequences. The family support worker testified that the children were very disrespectful to

Tom during visitation but that Tom was not able to recognize that behavior.

Tom was described as the "softer" parent, who would give in to the children when Brandy would not. This would occur even in situations where Brandy was attempting to redirect in compliance with the family support worker's advice.

Another family support worker testified to her concern about Tom and Brandy's communication. That worker testified that during the 9 months she had worked with the family, she could recall just one instance of Tom's standing up to Brandy, and that she did not believe Tom could protect the children from Brandy.

During Tom's testimony regarding his case progression, he stated that he believed he was making progress based upon what people were telling him and that often, he would go to team meetings and be surprised Brandy had created yet another "pitfall[] or downfall[]."

Ledesma and others expressed concern about Tom's ability to protect the children. Ledesma testified that her concern was that Tom had failed to protect the children. And Cheloha testified similarly that Tom had failed to protect the children from unsafe situations. Cheloha also noted that the children had interaction with inappropriate individuals and that the blame for that lay with both Tom and Brandy.

Cheloha also expressed concern that the children would act in ways that Tom would be unable to handle, including tantrums, fighting, trouble getting out of bed in the morning, and bed-wetting. Cheloha also referenced Tom's parenting history, specifically, prior "CFS cases" concerning his older daughter from a previous marriage.

In Tom's defense to these allegations, he explained that when Brandy was yelling at the children, he would remove them from the immediate situation. But because he knew he was Brandy's ultimate target, he assumed the children would be fine when he was out of the home. For this reason, Tom indicated he was not concerned about leaving the children alone with Brandy.

But ultimately, all the evidence at trial tended to show that the children loved Tom. No one expressed any concern about the children's safety around Tom. The testimony was that if Tom would work on his parenting and would not be so "soft," then Tom "could be a good dad."

### 10. Continued Viability of Tom and Brandy's Relationship

A continuing theme throughout the record was whether Tom would be willing to leave Brandy. And in the beginning, it was clear that Tom wanted to stay with Brandy. Maxson testified that during Tom's psychological testing, Tom indicated he was not going to leave Brandy because he felt that without him, "she would fall apart." Other testimony also indicated that Tom did not want to leave Brandy, because he felt that she had made some changes and things were going well.

By April 2012, Tom admitted in therapy that he and his attorney had discussed Tom's leaving Brandy if it meant he could get the children back, though he did not want to do this because he thought Brandy had made a lot of changes. But in August, Tom and Brandy indicated in a couple's session that they had discussed relinquishing their parental rights to the children, though they expressed that this was not something they wanted to do.

In October 2012, around the time that Tom was at perhaps the height of his frustration with Brandy, he indicated that he had considered leaving Brandy and filing for sole custody. But Tom told Hock, with whom Tom and Brandy received couples' counseling, that Brandy did not understand Tom meant it when he said that he was leaving and wanted the children and that there would be no way for her to "'sneak around'" to see them whenever she wanted. By the time the State filed for termination in January 2013, Tom and Brandy were considering having Brandy move out so that Tom could gain custody of the children.

At the hearing, Tom was reminded of various conversations he had had at team meetings in which the State suggested that if Tom were to move out, visitation between Tom and the children could be arranged. Tom testified that at the time, he was

resistant to that idea, because he did not want to take Brandy away from the children.

When Tom first testified at the hearing, he indicated that he and Brandy planned to stay together. But Tom later testified that he could raise the children by himself, though he knew he would need family support to do so. Tom testified that he was in a better position to be a good parent and to stand up to Brandy because of the counseling and guidance received over the last few years.

And when asked, if he were given the choice between having the children home and having Brandy continue to live in the home, he indicated he would choose having the children home.

## 11. Procedural History

As is noted above, the children were removed from the home on March 28, 2011, and a petition to adjudicate was filed the next day. The children were adjudicated on April 6. Seven review hearings were held approximately every 3 months over the next 22 months. Tom and Brandy were represented by counsel, who appeared at each of those hearings, including the adjudication. Tom and Brandy were present at the adjudication and all but two of the review hearings. For a short time at the beginning of the process, Brandy was appointed a guardian ad litem, who attended two review hearings. In addition, the children's guardian ad litem was present at all review hearings.

The Department of Health and Human Services' case plans regarding the family were offered at these review hearings. The first case plan dealt with the original reason for removal, i.e., the unsanitary home condition. By the second case plan, filed on August 8, 2011, and approved at an August 10 hearing, reports of prior abuse suffered by the children had surfaced. And the November 7 case plan, prepared for the November 9 review hearing, contained further allegations of abuse occurring during Tom and Brandy's visitation with the children. All subsequent case plans focused on the original reason for adjudication—the unsanitary home condition—as well as Tom and Brandy's parenting skills and the abuse allegations.

On January 16, 2013, the State filed to terminate Tom's and Brandy's parental rights. On January 24, Brandy's guardian ad litem was reappointed. Trial was scheduled for March 14.

Following a 5-day trial, the county court entered an order terminating Tom's and Brandy's parental rights. The county court concluded that the State had proved by clear and convincing evidence that Brandy was unable to discharge her parental responsibilities due to mental illness or deficiency under Neb. Rev. Stat. § 43-292(5) (Cum. Supp. 2012).

The court also concluded that the State had proved by clear and convincing evidence that Tom and Brandy had substantially and continuously or repeatedly neglected and refused to give Nicole and Sandra necessary parental care and protection under § 43-292(2), that Nicole and Sandra had been in out-of-home placement for 15 of the most recent 22 months under § 43-292(7), and that reasonable efforts to preserve and reunify the family had failed under § 43-292(6). However, the court found insufficient evidence to support a finding that termination was proper under § 43-292(9), subjecting the child to aggravated circumstances based upon the sexual abuse, and dismissed that ground. The court further concluded that it was in the best interests of Nicole and Sandra that Tom's and Brandy's parental rights be terminated. The county court did not make any specific finding as to Tom's or Brandy's parental fitness.

## III. ASSIGNMENTS OF ERROR

On appeal, Brandy assigns that the county court erred in (1) finding that the State proved by clear and convincing evidence grounds for termination under § 43-292(2), (5), (6), and (7); (2) finding that reasonable efforts to reunify the family had failed; (3) finding that the children had been in out-of-home placement for 15 of 22 months; (4) not finding that Brandy had rehabilitated herself to a minimum level of fitness; and (5) finding that termination of Brandy's rights was in Nicole's and Sandra's best interests. Additionally, Brandy argues that the county court's findings were contrary to the evidence and that minimum due process standards were not met.

On cross-appeal, Tom assigns, renumbered, that the county court erred in (1) finding that the State had proved grounds for termination by clear and convincing evidence and (2) finding that termination was in the children's best interests. Tom also assigns that the procedures utilized by the county court, in particular, the failure to apply the Nebraska Evidence Rules with respect to hearsay, did not meet minimum due process standards.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[1] When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.[2]

## V. ANALYSIS

Brandy assigns as error several findings of the juvenile court. In her brief, she explains that her assignments fall into three categories: that the juvenile court (1) failed to "meet established due process guidelines"; (2) failed to provide her time to "eliminate or ameliorate identified mental deficiencies" once they had been noted in the case plan and court reports, namely the fact that family therapy was not conducted; and (3) erred in finding the State had proved by clear and convincing evidence that the termination of her parental rights was in the children's best interests.[3] However, Brandy argues only that family therapy should have been attempted and that she should be given more time to rehabilitate herself before her parental rights are terminated.

Tom also assigns several errors to the juvenile court, but the crux of his argument on appeal is twofold: (1) The juvenile court erred in finding the State proved by clear and convincing evidence that there were grounds to terminate his parental

---

[1] *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

[2] *Id.*

[3] Brief for appellant at 8.

rights and that such termination was in the children's best interests, and (2) his due process rights were violated when Nicole's hearsay statements were admitted into evidence.

[2,3] Under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in the section have been satisfied and that termination is in the child's best interests.[4] The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.[5]

[4-8] A parent's right to raise his or her child is constitutionally protected; as such, before a court may terminate parental rights, the State must also show that the parent is unfit.[6] There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit.[7] The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests.[8] In discussing the constitutionally protected relationship between a parent and a child, we have stated that """[p]arental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being.""'[9] The best interests analysis and the parental fitness

---

[4] *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009).

[5] *Id.*

[6] *In re Interest of Kendra M. et al., supra* note 1.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 1033-34, 814 N.W.2d at 761.

analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.[10]

[9,10] The fact that a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness.[11] Instead, the placement of a child outside the home for 15 or more of the most recent 22 months under § 43-292(7) merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.[12]

## 1. Termination of Brandy's Parental Rights

[11] On appeal, Brandy assigns multiple assignments of error. But in her brief, Brandy argues only that the county court erred in terminating her parental rights, and more particularly argues that she should be permitted to participate in family therapy with the children. Because Brandy does not argue her other assignments of error, we decline to address them. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[13]

In order to terminate Brandy's parental rights, the State must rebut the presumption that Brandy is a fit parent and that it is in the best interests of her children for her rights to remain intact. The State must also show statutory grounds to support the termination.

---

[10] *Id.*

[11] *Id.*; *In re Interest of Angelica L. & Daniel L., supra* note 4; *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007).

[12] *In re Interest of Angelica L. & Daniel L., supra* note 4.

[13] *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013).

### (a) Parental Unfitness

We begin by addressing the county court's implicit finding that Brandy was unfit, and we conclude that the State has met its burden of showing that Brandy is unfit. ""'"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being."'"[14]

The circumstances surrounding Brandy's mental illness suggest that Brandy is unfit. Her psychological profile, as set out above in detail, is concerning. The State presented evidence that Brandy suffers from "sufficient mood variability of both depressive and hypomanic symptoms to be problematic," a "step-down diagnosis from a bipolar disorder."

According to Maxson, the therapist who conducted Brandy's testing, medication was "essential." Maxson also noted that while Brandy's "current medication has reduced some of [Brandy's] anger and depression . . . without consistent accountability and supervision, her behavioral patterns will likely return." But the State produced significant evidence that Brandy was often not medication compliant and would lie about that fact. And Brandy's profile indicates that she is likely to revert to her prior ways without consistent accountability and supervision.

In addition, Brandy has repeatedly verbally and physically abused the children, both before and since they were removed from the family home. The verbal abuse included threats to the children that Brandy would stab them while they slept. These threats were so intense that, over 2 years later and after therapy, Nicole still fears being left alone with Brandy. Nicole has repeatedly indicated that she does not believe Brandy's abuse will stop, and Nicole fears that Brandy will enter her bedroom at the foster home while she sleeps. Meanwhile, Brandy denies that much of this abuse occurred.

Moreover, both children were sexually abused by a friend of Brandy's. While there is nothing to suggest that Brandy

---

[14] *In re Interest of Kendra M. et al., supra* note 1, 283 Neb. at 1033, 814 N.W.2d at 761.

was aware of the abuse at the time it occurred, when Brandy did learn of it, she did not sufficiently report the abuse to law enforcement and, for a time at least, had some contact with the perpetrator.

That the children have suffered psychologically at Brandy's hands seems clear. Both children have been diagnosed with an adjustment disorder. Nicole has additionally been diagnosed with posttraumatic stress disorder, and Trantham, the children's therapist, believes that Sandra might also have reactive attachment disorder. On at least one occasion, Brandy interfered with Nicole's therapy by asking Nicole to request a resumption of semisupervised visits. Brandy initially denied doing this. Immediately following this interference, Nicole began suffering from dissociation, trouble sleeping, auditory hallucinations, and impaired concentration.

Other evidence showed that Brandy often put the needs of others ahead of the needs of her children and ignored them during visitation in favor of spending time with other relatives. And evidence was presented that Brandy had failed to meet any of her therapy goals.

The family's caseworkers testified that Brandy had made minor progression on her case plan. Brandy had shown some progress on her parenting skills, and the unsanitary home condition that had precipitated the children's adjudication was largely resolved. In addition, Brandy had, eventually, consistently attended, though perhaps not fully participated in, her therapy appointments, and additionally attended some couples' sessions with Tom. She also appears to currently be taking her medication.

While in the short term Brandy might be stable, she has spent a long time being unstable. Brandy's history is suggestive. Given that history, Brandy cannot be trusted to maintain this stability. This court can consider this history when determining whether to terminate parental rights.[15] And certainly, the children should not be made to wait and see if Brandy can remain healthy for them. We have said that "[c]hildren cannot,

---

[15] *In re Interest of Kendra M. et al., supra* note 1.

and should not, be suspended in foster care or be made to await uncertain parental maturity."[16]

We conclude that the State has met its burden of rebutting the presumption that Brandy was a fit parent.

### (b) Best Interests

We turn next to the question of whether it is in the children's best interests that Brandy's parental rights be terminated. While a separate inquiry from the determination as to Brandy's fitness, both are fact intensive and examine essentially the same underlying facts as the other. This presumption is only overcome when a parent has been proved unfit.[17]

As noted above, while in Brandy's care, the children were subject to physical and verbal abuse such that Nicole is still afraid to be alone with Brandy. By and large, Brandy denies that this abuse occurred. Yet, Ledesma, one of the children's caseworkers, testified that the children told her that they felt unsafe when at home with Brandy.

Moreover, both children have been diagnosed with an adjustment disorder. Nicole has also been diagnosed with posttraumatic stress disorder, and Sandra might have reactive attachment disorder. Nicole is often anxious, and Sandra has trust issues with adults. We also note the sexual assault of the children and Brandy's failure to report it in a timely manner.

The children have been successful in the foster home. They are both doing well in school, with few behavior issues. They are involved in extracurricular and church activities. Their foster parents are willing and able to adopt them.

Trantham testified that it was in the children's best interests that Brandy's parental rights be terminated and further testified that reunification was not possible. We agree, and conclude that the State has met its burden to show that termination of Brandy's parental rights is in Nicole's and Sandra's best interests.

---

[16] *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008).

[17] See *In re Interest of Angelica L. & Daniel L., supra* note 4.

### (c) Statutory Basis

Finally, we turn to the question of whether the State showed sufficient statutory grounds to support the termination of Brandy's parental rights. The county court concluded that the State had proved sufficient grounds under § 43-292(2), (5), (6), and (7). We agree.

Much of the evidence supporting these grounds is set forth above. Section 43-292(2) provides for termination in cases where the parents have "substantially and continuously or repeatedly neglected or refused to give . . . necessary parental care and protection." And in this case, § 43-292(2) was met, because, as is described in more detail above, Brandy verbally and physically abused the children.

Section 43-292(5) provides for termination when the parents are "unable to discharge parental responsibilities because of mental illness . . . and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." We conclude that the State has proved this statutory ground with the evidence of Brandy's mental illness diagnosis and her failure to consistently take her medication despite the fact that it was deemed "essential."

We also note that the children have been out of the home since March 28, 2011. The State filed for termination on January 16, 2013. At that time, the children had been in out-of-home placement for over 21 months. Thus, there is sufficient evidence in the record to show that the children were in out-of-home placement for 15 of the most recent 22 months under § 43-292(7).

We note that Brandy argues family therapy ought to have been attempted. But Trantham and Eigenberg both testified that family therapy was not indicated because the children were not ready. At some point, the children might have been ready for family therapy. But many of the reasons for the failure to undergo such therapy can be pinned on Brandy's failure to take responsibility for the abuse of the children. We find Brandy's argument regarding family therapy without merit.

The State offered sufficient evidence to support the above statutory grounds for termination. Because there were statutory grounds and because the State rebutted the presumption that Brandy was a fit parent and that it was in the children's best interests for Brandy's rights to remain intact, the decision of the county court terminating Brandy's parental rights is affirmed.

### 2. Tom's Parental Rights

As with Brandy, in order to terminate Tom's parental rights, the State must rebut the presumptions that Tom is a fit parent and that it is in the best interests of his children for his rights to remain intact. The State must also show that a statutory basis for the removal is present.

As we did when considering Brandy's rights, we begin with parental fitness. As we note above, the State bears the burden of rebutting the presumption that Tom is a fit parent. We conclude that the county court erred in its implicit finding that Tom was unfit and accordingly reverse the county court's termination of Tom's parental rights.

The State presented evidence that Tom failed to protect the children from Brandy. In particular, the State contends that because Tom did not leave Brandy, call a child abuse hotline, contact law enforcement, or even make sure that a trustworthy person was around to watch the children in his absence, he is unfit.

It is undisputed that Tom did not call law enforcement or the abuse hotline. But it is disingenuous to conclude that Tom did not protect the children from Brandy. Tom would remove them from Brandy's presence when she would engage in verbal abuse directed at the children. He insists that he never witnessed any physical abuse. And he testified that he was not concerned about abuse when he was not home, because he believed that Brandy was taking her anger at him out on the children, to make him hurt, and that if he was not present, the trigger was not there. Such a conclusion is not inconsistent with Brandy's psychological profile, which suggested that Brandy's actions toward the children were done at least in part as a way to antagonize Tom.

It is true that Tom continued to reside with Brandy both before and after the children were removed from the home. And Tom declined the opportunity to pursue visitation with the children if he would move out or have Brandy move out. But Tom's case plan never provided that he needed to leave Brandy. Until the State filed for termination, the primary case plan for the family was reunification, though eventually adoption was listed as a secondary plan. Throughout this process, Tom underwent couples' therapy and joint visitation with Brandy, while his own counseling saw him work on a safety plan due to Brandy's instability.

We further note that Tom's psychological profile provides that "Tom will have some difficulty understanding multi-step directions and complicated instruction. It will be important to double check that Tom has a clear understanding of what is expected of him prior to making the assumption that he understands."

Tom suffers from an adjustment order, apparently due to the removal of his children from the home. His intelligence is borderline/below average. His profile indicates that he is a "victim." His parenting skills are inconsistent, and he is described as "weak" and "soft." Tom appears to be overly optimistic about Brandy's ability to change, to the extent that he denies her bad behavior unless directly presented with it.

But still, Tom functions on a day-to-day basis. He has a job and pays the bills. He loves the children, and they love him. Aside from one allegation from Nicole, barely addressed in the record, that Tom once pulled her hair, there are no concerns by anyone that Tom would physically harm the children. Tom now indicates that he is willing to leave Brandy so that he can parent the children on his own, and the evidence presented in the record suggests that, with help, he is capable of doing so.

Tom is not a perfect parent. But as we have often emphasized, perfection of a parent is not required. We conclude that the State did not rebut the presumption that Tom is a fit parent. As such, the county court erred in terminating Tom's parental rights. We need not address whether the State rebutted the presumption that termination was in the children's best interests

or whether statutory grounds for termination were shown. And because we conclude that termination of Tom's parental rights was in error, we decline to address Tom's arguments that Nicole's statements were inadmissible hearsay. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.[18]

## VI. CONCLUSION

We affirm the county court's order terminating Brandy's parental rights. But because the State did not rebut the presumption that Tom was a fit parent, the county court's order terminating Tom's parental rights is reversed.

Affirmed in part, and in part reversed.

---

[18] *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

---

Brenda R. Rice, appellant, v. Christina Webb,
Personal Representative of the Estate of
Dale E. Rice, deceased, appellee.
___ N.W.2d ___

Filed March 21, 2014.    No. S-13-458.

1. **Divorce: Judgments: Appeal and Error.** The meaning of a divorce decree presents a question of law, in connection with which an appellate court reaches a conclusion independent of the determination reached by the court below.
2. **Judgments: Divorce: Property Settlement Agreements.** A dissolution decree which approves and incorporates into the decree the parties' property settlement agreement is a judgment of the court itself.
3. **Courts: Jurisdiction: Divorce: Property Settlement Agreements.** A district court, in the exercise of its broad jurisdiction over marriage dissolutions, retains jurisdiction to enforce all terms of approved property settlement agreements.
4. **Courts: Jurisdiction.** A court that has jurisdiction to make a decision also has that power to enforce it by making such orders as are necessary to carry its judgment or decree into effect.
5. **Divorce: Insurance.** The general rule is that divorce does not affect a beneficiary designation in a life insurance policy.
6. **Divorce: Property Settlement Agreements: Intent.** If the dissolution decree and any property settlement agreement incorporated therein manifest the parties' intent to relinquish all property rights, then such agreement should be given that effect.