IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF DON'KAVEON S. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DON'KAVEON S. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
KAY S., APPELLANT.

Filed June 10, 2014.    No. A-14-019.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Molly Adair-Pearson, of Adair Pearson Law, for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer Chrystal-Clark for appellee.

Lynnette Z. Boyle, of Tietjen, Simon & Boyle, guardian ad litem.

MOORE, PIRTLE, and RIEDMANN, Judges.

MOORE, Judge.

INTRODUCTION

Kay S. appeals from the order of the separate juvenile court of Douglas County, which ordered continued placement of Kay's minor children outside her home and found that reasonable efforts had been made to prevent the children's removal from Kay's home. Because we find that reasonable efforts were made, that the court did not err in ordering continued detention of the children with placement outside Kay's home, and that Kay's due process rights were not violated, we affirm.

- 1 -

BACKGROUND

*Procedural History.*

Kay is the mother of Don'Kaveon S., born in 1999; Janeshja S., born in 2001; Lovell S., born in 2004; Jason S., born in 2009; Kaden S., born in 2011; and Jaylon S., born in 2013. Kay is also the mother of an older child, referred to in the record as both "Michael K." and "Corey S.," who was adopted by another family prior to the January 2011 petition filed in this case and who aged out of the juvenile court system in May 2013. For consistency, we have referred to this child as "Michael." Because the children's fathers are not involved in the present appeal, we do not discuss them in this opinion.

Kay has a history of involvement with the Nebraska Department of Health and Human Services (the Department). In February 2006, the Department received intakes alleging inappropriate physical discipline of Don'Kaveon and Janeshja. Don'Kaveon, Janeshja, and Lovell were removed from the home, and a petition was filed in the juvenile court. The children were returned home in August, and the case was successfully closed in December. Intakes received in January 2010 were closed as unfounded.

In January 2011, the Department received an intake alleging sexual abuse of Janeshja and Lovell by Don'Kaveon, Michael, and their cousins. On January 26, the State filed a petition in the juvenile court, alleging that Don'Kaveon, Janeshja, Lovell, and Jason came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008), due to the faults or habits of Kay. Specifically, the State alleged that one or more of the children engaged in inappropriate sexual behavior and/or had been sexually victimized; that Kay failed to take sufficient steps to protect the children; that Kay had failed to provide proper parental care, support, and/or supervision for the children; and that, due to these allegations, the children were at risk for harm. The State also filed a motion for temporary custody and removal affidavit, and on January 26, the court entered an order for immediate custody of all of the children with placement to exclude Kay's home. Don'Kaveon has remained in out-of-home placement since that time.

On June 21, 2011, the juvenile court accepted Kay's no contest plea to certain allegations of the petition and entered an order adjudicating Don'Kaveon, Janeshja, Lovell, and Jason as being within the meaning of § 43-247(3)(a). The court continued the children's out-of-home placement. Lovell and Jason were returned to Kay's home in December. Kaden was born in 2011 and was also residing with Kay at this time.

In May 2012, the Department received an intake alleging that Kay was leaving Lovell, Jason, and Kaden home alone and not providing adequate supervision. The intake also alleged educational neglect of Lovell. The intake was agency substantiated, and additional services were put in the home to allow Kay to maintain placement of her three youngest children. Janeshja was returned to Kay's home in October.

Jaylon was born in early 2013. In March 2013, the Department received an intake alleging domestic violence between Kay and her boyfriend and physical neglect of the children in the home. On March 28, the State filed a second supplemental petition, alleging that Don'Kaveon, Janeshja, Lovell, Jason, Kaden, and Jaylon were within the meaning of § 43-247(3)(a) due to the faults and habits of Kay. The State's specific allegations included allegations that Kay had violated a safety plan designed to address the sexualized behavior of

one or more of the children and prevent further sexual victimization of the children by (1) failing to prevent Janeshja from subjecting Don'Kaveon to inappropriate touching, (2) allowing one or more of the children to have unsupervised access to the Internet, (3) allowing one or more of the children to have contact with Michael, (4) lying down and closing her eyes for the entirety of a visit and not interacting with the children, (5) allowing Janeshja and Lovell to share a bed and blanket outside of Kay's supervision, (6) repeatedly leaving one or more of the children alone in a separate room to be supervised by Janeshja, and (7) failing to consistently bring Lovell and Janeshja to individual therapy. The State also filed a motion for temporary custody and supporting affidavit, and on March 28, the court entered an order for immediate custody with placement for all six children to exclude Kay's home. Don'Kaveon remained in his placement, and the remaining five children were removed from Kay's home on March 29.

On April 3, 2013, the juvenile court granted a motion filed by Kay requesting a continuance of a review and permanency planning hearing scheduled for April 5 and the detention hearing scheduled for April 9 due to Kay's being out of the country during that period. The court continued the hearings to June 4; also continued to June 4 was the hearing on a motion filed by the Department, seeking to change Don'Kaveon's visitation with Kay from semisupervised to supervised.

At the June 4, 2013, hearing, the juvenile court proceeded initially with the detention/protective custody hearing on the second supplemental petition. The State presented testimony from a caseworker for the family. Time for the hearing expired at the conclusion of the caseworker's testimony on direct examination. Additional hearing time was scheduled for June 26.

On June 26, 2013, the juvenile court first received exhibits offered for the review and permanency planning hearing as to all parents. The court continued the review and permanency planning hearing to September 5 to allow Kay's attorney the opportunity to cross-examine the authors of certain exhibits. The court received additional exhibits with respect to the detention/protective custody and the Department's motion for supervised visitation, and heard additional testimony from the caseworker before time for the hearing expired.

On August 29, 2013, the detention/protective custody hearing and the hearing on the Department's motion for supervised visitation resumed. The State presented testimony from Janeshja's therapist before the hearing time expired. The court continued the hearings to September 5. On September 5, on the joint motion of the parties, the court continued the hearings scheduled for that date due to witness unavailability.

The continued hearings concluded on November 21, 2013. On that date, the State presented testimony from a "CASA" worker assigned to the case and another caseworker. Kay presented testimony from a visitation worker.

*Summary of Evidence.*

The evidence presented at the above-referenced hearings in June, August, and November 2013 showed that the family has been offered services including intensive family preservation; semisupervised visitation services; family support services; and individual and family therapy for Kay, Don'Kaveon, Janeshja, and Lovell.

Safety plans were developed for Kay and the children to follow in April and May 2012. Provisions of the safety plans included requirements that Don'Kaveon and Janeshja be supervised in line of sight and earshot when with their siblings, that Don'Kaveon and Janeshja would not engage in horseplay or tickling with each other or their siblings, that Don'Kaveon could not use the telephone or Internet without adult supervision at all times, and that Don'Kaveon and Janeshja would not go into their siblings' bedrooms or allow siblings in their rooms without adult supervision. Multiple witnesses testified that if the safety plans were not followed, further sexual abuse could occur in the home.

Evidence was presented concerning Kay's supervision of the children. This evidence generally shows that Kay allowed Don'Kaveon and Janeshja to have unsupervised contact with their younger siblings, including Janeshja's sharing a bedroom with her siblings. Janeshja's therapist testified that it was critical for a child such as Janeshja, who has been a victim of abuse and has a history of sexual behavior problems, to have her own room. These concerns about unsupervised contact were shared with Kay, who, despite having signed off on the safety plan, stated she was not aware that Janeshja was not allowed to have unsupervised contact with the other children. Evidence was also presented about Janeshja's boundary problems. Janeshja has been observed hugging and kissing her brothers and sitting in their laps, making them uncomfortable. There was evidence that Kay would observe and fail to redirect Janeshja's behavior. A caseworker testified that certain programming provided to the family would have educated them about appropriate interactions between children, especially those with a history of sexualized behavior, and that this programming would have addressed things such as sitting on the lap of another child or excessive touching.

Kay has allowed unsupervised Internet use by Don'Kaveon and has allowed Internet contact between Don'Kaveon and Michael. The safety plans do not expressly prohibit contact with Michael, but do provide that Don'Kaveon's Internet usage is to be supervised by an adult. A caseworker testified that she was concerned about this contact because of Michael's past sexual abuse of some of the children in the family. She testified to her concern that such contact would cause Don'Kaveon to act out sexually toward his younger siblings or other children. She was also concerned that Kay did not recognize the possible danger such contact posed for her children.

Evidence was presented with respect to additional concerns, including the children's nutrition and medical care and the domestic violence occurring in the home. Visitation workers reported various concerns to the caseworkers, including the children not having full and balanced meals in the home. In general, the record shows that sufficient nutritious food is not always available in the home. The record also shows that the children's medical doctors have reported concerns that Kay has not been taking the children for regular medical checkups and has not been refilling certain prescription medication for one of her children, although Kay denied these allegations. One of the caseworkers also testified about the children's report of domestic violence between Kay and her boyfriend the night before the children's removal from the home in March 2013.

Therapeutic services have been offered to the family since at least May 2011. The record shows that Janeshja and Lovell attended therapy regularly while in foster care but that their attendance was sporadic when placed in Kay's home. Don'Kaveon, who has been in foster care

since his removal from Kay's home in January 2011, has consistently participated in therapy. Kay is supposed to participate actively in the children's therapy. As of the June 4, 2013, hearing, Kay had not participated in Don'Kaveon's therapy and had not actively participated in Janeshja's therapy for the past few months. Kay discontinued the children's family therapy at some point, expressing her belief that it was not necessary, since the children would be coming home after a hearing in June 2013. Janeshja's therapist testified that family therapy was important for Janeshja's overall therapeutic progress and that the lack of family therapy had affected her ability to progress. There was also evidence that Kay stopped going to her own individual therapy in November 2012.

Kay's transportation issues hindered her ability to transport the children to therapy. Kay did not have a working vehicle for at least part of the time between December 2012 and February 2013. Kay's caseworker discussed transportation options with Kay and helped Kay locate funding for repair work which had to be done at a licensed repair shop. The first shop selected by Kay was unlicensed, and it took more than a month to get the car to a licensed shop. The caseworker assisted during this period by making telephone calls to check on the car's status and to find out how it could be moved to a licensed shop. After the selected licensed shop determined that the car was totaled, the Department set up other transportation services for Kay, but these services could only be provided directly to Kay and the child attending the particular therapy appointment. Kay would have needed to obtain daycare for the other children in order to utilize these transportation services, and her caseworker discussed daycare options with her. Kay was reluctant to utilize daycare, and the options discussed did not work out for Kay on a regular basis. A caseworker testified that if Kay had requested other assistance from the Department, it would have been provided to her.

*Juvenile Court Decision.*

On December 3, 2013, the juvenile court entered an order, finding it would be contrary to the health and safety of the children to be returned to Kay's custody and ordering that they remain in the Department's custody with placement to exclude Kay's home. The court found that reasonable efforts were made to return the children to Kay's home and to maintain the children in the home. The court found that Kay was a "chronic violator" of the safety plan and that she had "little to no insight into the needs of her children." The court ordered supervised visitation between Kay and the children as arranged by the Department and specifically granted the Department's motion for supervised visitation between Kay and Don'Kaveon. Kay subsequently perfected her appeal to this court.

ASSIGNMENTS OF ERROR

Kay asserts that the juvenile court erred in (1) determining that reasonable efforts were made to maintain the children in her home prior to removal and to return the children to her home after removal, (2) ordering continued detention of the children with placement to exclude her home, and (3) violating her due process rights due to the time elapsed between entry of the ex parte order for immediate custody and conclusion of the detention hearing and subsequent order.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.* In reviewing questions of law arising under the Nebraska Juvenile Code, an appellate court reaches conclusions independent of the lower court's rulings. *In re Interest of Candice H.*, 284 Neb. 935, 824 N.W.2d 34 (2012).

ANALYSIS

*Reasonable Efforts.*

Kay asserts that the juvenile court erred in determining that reasonable efforts were made to maintain the children in her home prior to removal and to return the children to her home after removal.

The State had a statutory obligation in this case to make reasonable efforts to preserve and reunify the family. Neb. Rev. Stat. § 43-254 (Supp. 2013) provides in part:

> If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (2) of section 43-248, the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under subsections (1) through (4) of section 43-283.01.

None of the exceptions set forth in Neb. Rev. Stat. § 43-283.01(4) (Cum. Supp. 2012) are present in this case. Also relevant to our analysis is § 43-283.01, which provides in part:

> (1) In determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern.
>
> (2) Except as provided in subsection (4) of this section, reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home.

The record shows that the family has been offered services, including intensive family preservation; semisupervised visitation services; family support services; and individual and family therapy for Kay, Don'Kaveon, Janeshja, and Lovell. Safety plans were implemented for Kay and the children to follow in mid-2012. Kay addresses most of her arguments to the type of transportation assistance provided to help her take the children to therapy between December 2012 and March 2013 and to the line-of-sight requirement of the safety plans.

With respect to transportation, the record shows that funding was offered to help Kay get her car fixed near the end of 2012. The funding was contingent on Kay's taking the car to a licensed repair shop, and it was her responsibility to take the car to such a shop. A monthlong delay resulted when Kay initially took the car to an unlicensed shop, and it was ultimately determined that the car was not repairable. After that time, alternative transportation was

arranged. The Department provided assistance in contacting the repair shop and discussing other options with Kay. The record shows that Kay rejected or was reluctant to use certain options discussed and that she did not seek certain other assistance that the Department would have provided had Kay asked.

With respect to the requirements of the safety plans, the record does show that the line-of-sight requirement presented certain difficulties due to the layout of the house and the number of children in the home. However, the safety plans did not require that Kay keep all of the children in sight at all times. The plans required, among other things, that Don'Kaveon be in sight with children 10 years and younger and that Don'Kaveon and Janeshja be within eyesight and earshot when on visits with their siblings. Also, Don'Kaveon and Janeshja were not to be in a bedroom with their siblings without adult supervision. As Don'Kaveon was not placed in the home, the plans required Kay to keep him within sight only when on visits. After Janeshja's placement in the home, the plan required Kay to keep only Janeshja within eyesight (at least on the occasions when Don'Kaveon was not visiting). The safety plans were implemented due to the sexual abuse that occurred involving Michael, Don'Kaveon, Janeshja, Lovell, and certain of the children's cousins. Given the seriousness of the situation, a requirement that Kay closely monitor Janeshja's behaviors and actions (and Don'Kaveon when he was visiting) was not unreasonable.

The juvenile court did not err in finding that reasonable efforts were made to maintain the children in Kay's home prior to removal and to return them to her home after removal.

*Continued Detention.*

Kay asserts that the juvenile court erred in ordering continued detention of the children with placement to exclude her home. Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Damien S.*, 19 Neb. App. 917, 815 N.W.2d 648 (2012). As noted above, to order continued detention of a child, the court must find both that continuation of the child in the family home would be contrary to the child's health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family. See § 43-254. We have already determined that the court did not err in finding that reasonable efforts have been made. We further find no error in the court's determination that it would be contrary to the children's health and safety to be returned to Kay's home.

Kay relies on the testimony of the visitation worker who testified on her behalf. The visitation worker testified that during her involvement in the case, she observed no safety concerns, specifically with respect to Lovell and Kaden, and never had to redirect Kay with regard to her parenting. However, this visitation worker previously provided contrary information to other persons involved in the case. This worker was removed from the case in October 2013 due to concerns as to her objectivity.

As discussed above, the safety plans were developed because of the sexual abuse that occurred in the home, involving Michael, Don'Kaveon, Janeshja, Lovell, and their cousins. Multiple witnesses testified that if the safety plan was not followed, further sexual abuse could occur. Various witnesses testified to deficiencies in Kay's supervision of children. Don'Kaveon

and Janeshja were allowed to be alone with the other children. Kay failed to redirect Janeshja when she initiated contact with her brothers that made them uncomfortable. Kay also allowed Internet contact with Michael, one of the perpetrators of the sexual abuse, and while contact with Michael was not expressly forbidden, several witnesses testified to their concerns that such contact could trigger further behaviors and reflected Kay's lack of understanding as to the seriousness of the problem. There was also evidence in the record that Kay was not properly addressing the children's medical needs and not always providing plentiful, nutritious food. And, while Kay's car issues did hamper her ability to take the children to therapy, the record also reflects her lack of understanding of the importance of therapy to the children's mental health. Kay stated that therapy was not needed and discontinued both the family therapy and her own individual therapy. One of the caseworkers opined that the youngest five children would be at risk for harm if returned to Kay's home based on the reports received, consistent failure to follow the safety plan, and lack of success in the services provided to alleviate the concerns raised.

The State established by a preponderance of the evidence that continued detention of the children with placement outside Kay's home was necessary for their welfare. The juvenile court did not err in ordering continued detention of the children with placement excluding Kay's home.

*Due Process.*

Kay asserts that the juvenile court violated her due process rights due to the time elapsed between entry of the ex parte order for immediate custody and conclusion of the detention hearing and subsequent order.

Following the issuance of an ex parte order for immediate custody, a prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental rights. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). This hearing is a parent's opportunity to be heard on the need for the removal and the satisfaction of the State's obligations under § 43-283.01 (reasonable efforts must be made to preserve and reunify family), and it is not optional when a child is detained for any significant period of time. *Id.* The State may not unreasonably delay in providing a parent a meaningful hearing after entry of an ex parte temporary custody order. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998) (mother's due process rights were not violated by 14-day delay between entry of ex parte order and detention order where she was given opportunity to be heard at detention hearing and was allowed to visit children in interim).

In *In re Interest of Mainor T. & Estela T., supra*, the Nebraska Supreme Court found that the mother was denied due process at various stages of the proceedings, including the detention hearing and the adjudication hearing, and further found that the bases for termination of her parental rights were not supported by the record. Regarding the detention hearing phase, the record contained no indication that the State ever notified the mother of what emergency action had been taken regarding the children or how she could contact the Department. Nor did the record contain any evidence that the State provided a meaningful opportunity for the mother to be heard on whether emergency removal was necessary.

This case is distinguishable from *In re Interest of Mainor T. & Estela T.* Here, there was an ongoing juvenile court proceeding regarding the four oldest children in which a case plan was in place and services were being provided. The second supplemental petition filed in March 2013 added the youngest two children to the action and alleged certain violations by Kay of the previous and ongoing safety plan. Thus, Kay was adequately advised as to the action taken regarding her children and was aware how to contact the Department.

In addition, the record shows that the initial delay in the detention hearing was at Kay's request. The ex parte order for immediate custody was filed on March 28, 2013, and the detention hearing was set for April 9, or 12 days following the ex parte order. However, Kay filed a motion on April 3, asking the court to continue the detention hearing and a review and permanency planning hearing because she planned to be out of the country. The court granted Kay's motion and continued the detention and review hearings, as well as the hearing on a visitation motion filed by the Department, to June 4.

Thereafter, the record shows several hearings were held and then continued because additional time was necessary to receive evidence. On June 4, 2013, the court received certain evidence in the detention hearing before the scheduled time elapsed. At the conclusion of the scheduled time, the court inquired as to how much time would be required to finish the scheduled matters. The State's attorney replied that it would take at least 2 hours. No other attorneys responded to the court's inquiry. Additional hearing time was scheduled for June 26. On June 26, the court first received evidence in the review hearing and continued the review hearing to September 5 to allow Kay's attorney an opportunity to cross-examine the authors of certain exhibits. The court then received additional evidence in the detention and visitation hearings before the scheduled time expired. At the conclusion of the time scheduled for June 26, the court again inquired as to the amount of time needed to conclude the presentation of evidence. The attorney for the State and the guardian ad litem provided input, but Kay's attorney did not. The detention and visitation hearings resumed on August 29, and the court heard additional evidence before the time scheduled for that date expired. The record does not show what discussion, if any, occurred with respect to further scheduling at the conclusion of the August 29 hearing, but the record does show that the detention and visitation hearings were continued to September 5, the date on which the review hearing was also scheduled to resume. The record on appeal does not contain a bill of exceptions from the September 5 hearing, but the court's order from that hearing shows that on the joint motion of the parties, the court continued the scheduled hearings due to witness unavailability. The continued hearings concluded on November 21, and the court entered its order for continued detention on December 3.

Although slightly over 8 months elapsed between the time of the ex parte custody order and the continued detention order, we conclude that under the particular circumstances of this case, Kay was not denied her due process rights. The first scheduled detention hearing date was only 12 days after issuance of the ex parte order, which was continued at Kay's request. Kay joined other parties in requesting at least one other continuance. Throughout the 8-month period, various hearings were held at which Kay was apprised of the reason for the detention of her children, services continued to be provided to Kay, and she continued to be allowed visitation with her children. She was given the opportunity, via an adversarial hearing, to contest the removal of the children from her home. She presented evidence and cross-examined witnesses.

While the situation presented in this case is not usual and should be avoided, we do not find that the elapsed time between the entry of the ex parte order and the conclusion of the detention hearing was unreasonable or a violation of Kay's due process rights. The juvenile court did not violate Kay's due process rights.

## CONCLUSION

Reasonable efforts were made to maintain the children in Kay's home prior to removal and to return them to her home after removal. The juvenile court did not err in ordering continued detention of the children with placement outside Kay's home and did not violate Kay's due process rights.

AFFIRMED.