IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF VICTORIA W. & LINDSEY W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF VICTORIA W. AND LINDSEY W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER C., APPELLANT.

Filed June 30, 2015.   No. A-14-1074.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Amy N. Schuchman, and Kati Kilcoin, Senior Certified Law Student, for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Christopher C. appeals from the decision of the separate juvenile court for Douglas County which terminated his parental rights to his children, Victoria W. and Lindsey W. We affirm.

BACKGROUND

Christopher is the biological father of twin girls, Victoria and Lindsey, born in October 2010. Melissa W. is the biological mother of both children. Christopher and Melissa W. were married at the time of the girls' births. Victoria and Lindsey were removed from the parental home in November 2010 because of domestic violence between Christopher and Melissa W. in the presence of the children and because of both parents' drug use. Both children have been in the

- 1 -

custody of the Nebraska Department of Health and Human Services (DHHS) and in an out-of-home placement since removal in November 2010. Melissa W. ultimately relinquished her parental rights to Victoria and Lindsey in September 2012. Christopher and Melissa W. divorced prior to Melissa's relinquishment. Because Melissa W. is not part of this appeal, we will only discuss her as necessary.

In November 2010, the State filed a petition alleging that Victoria and Lindsey were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of the parents. In March 2011, the juvenile court adjudicated the children to be within the meaning of § 43-247(3)(a). The court ordered Christopher to complete a domestic violence batterer's class, abstain from drugs and alcohol, submit to random urinalysis testing, complete an outpatient chemical dependency treatment program and any recommended aftercare, undergo a psychological evaluation with parenting assessment and participate in therapy as recommended, complete a parenting class, maintain safe and adequate housing and a legal source of income, and have supervised visitation.

The court held review and permanency planning hearings in September 2011, March and August 2012, April and September 2013, and in March 2014. The court ordered Christopher to complete a men's non-violence program, participate in family support services as recommended, abstain from drugs and alcohol, submit to random urinalysis testing, complete an outpatient chemical dependency treatment program and follow any recommended aftercare, complete a psychological evaluation with parenting assessment, continue to participate in therapy to address mental health issues, take medication as prescribed by doctors, address parenting issues either through family support services or a separately completed parenting class, participate in all services provided to his children to include services at the Attachment and Trauma Center, participate in family therapy with his children as recommended, maintain safe and adequate housing and a legal source of income, and have supervised visitation. (On September 30, 2013, Christopher was granted semi-supervised visitation with his children. However, on March 10, 2014, upon the State's motion, the court once again ordered visits to be fully supervised.)

On March 10, 2014, the State filed the operative motion for termination of Christopher's parental rights to Victoria and Lindsey pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2014). The State alleged that: Christopher had substantially and continuously or repeatedly neglected and refused to give said children, or a sibling, necessary parental care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; the children had been in out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

The termination hearing was held over the course of several days in June and October 2014. Testimony was given and evidence was received as to why Christopher's parental rights should be terminated.

The girls were removed from the parental home in 2010 because of domestic violence between Christopher and their mother, and parental drug use; the girls were never returned to the parental home. The girls were placed with their paternal grandmother from November 2010 to November 2012, when they were removed by DHHS for failure to thrive and lack of weight gain. The girls were placed with Julie Rannells, who was the girls' foster mother from November 2012

to May 2013. Melissa O. has been the girls' foster mother since June 2013. Both Rannells and Melissa O. testified that the girls had increased behavioral issues after visits with Christopher. For instance, Rannells testified that after visits, Lindsey was "more needy," very attached, required a lot of holding, woke up frequently, and had night terrors; Victoria was less phased, but was more aggressive and wound up after visits.

Christopher was 42 years old when the termination hearing began. He had an 8th grade education. He received social security disability because he was bipolar; he also held menial jobs such as selling vacuums and hauling items to the dump for people. It is undisputed in the record that Christopher had complied with all court-ordered services. However, the majority of the witnesses agree that despite those services, Christopher was still not able to independently parent Victoria and Lindsey, who have special needs.

Christopher participated in individual therapy with Keith Almquist, MS, LIMHP, LADC, from March through July 2013, after being diagnosed with bipolar disorder and schizoaffective disorder. Christopher was unsuccessfully discharged from therapy in August because Christopher objected to the diagnosis of schizoaffective disorder and would not sign off on the treatment plan; without Christopher's signature, treatment could not proceed. In October, Christopher was evaluated by Elizabeth Blayney, LICSW, LIMHP, who diagnosed him with Bipolar II Disorder, per client report/history. Apparently Blayney did not have the credentials to diagnose schizoaffective disorder, thus bipolar was her only diagnosis. Blayney saw Christopher for 10 sessions after the evaluation and he was successfully discharged because there were no new treatment goals. His case file with Blayney was closed in June 2014.

Kelly Fairbanks is a clinical psychologist. She performed a psychological evaluation and parenting assessment of Christopher in May 2011 and again in the fall of 2013. She testified that Christopher's diagnosis was: history of Bipolar I Disorder; cannabis abuse, full remission; alcohol abuse, full remission; history of polysubstance abuse; adjustment disorder with depressed mood; rule out schizoid personality disorder, and history of schizoaffective disorder. She testified that Christopher's intellectual functioning was in the low average range. In her written report of the 2013 evaluation, Fairbanks noted:

> When it comes to parenting, Christopher appears to have gone through the motions of all that's been asked of him by the court. He seeks to portray himself as a confident, capable parent who understands his daughter's [sic] special needs; however, it appears that he lacks insight and judgment for independent parenting abilities. Given Christopher's severe guardedness, it is too difficult to predict his psychological or parenting functioning. Thus, it is recommended that Christopher complete the recommended treatment and be re-evaluated in 6 months.

Fairbanks recommended that Christopher maintain regular contact with his psychiatrist for continued medication management, continue to attend Community Alliance and AA meetings to maintain sobriety, receive individual counseling to learn effective coping skills to reduce depression and to gain insight into himself and his functioning, and continue having supervised visits with his daughters to ensure he consistently applies good judgment and responsible parenting. Fairbanks acknowledged that she never observed Christopher with his daughters, nor

did she separately evaluate the girls. Fairbanks had no follow-up with Christopher after the 2013 evaluation.

Kris Walpus is a licensed independent mental health practitioner and a registered play therapist at the Attachment and Trauma Center of Nebraska. Eighty percent of her caseload involves working with children under 5 and their families. Walpus has treated Victoria and Lindsey weekly since January 29, 2013. Walpus incorporated Christopher into the girls' therapy starting in March. Walpus sees both girls together along with either Christopher or the foster parents; Christopher attends with the girls one week and the foster parents attend the next week and it continues on a rotating basis.

In January 2013, the girls were acting out, crying, in distress, and having nightmares. The girls were fighting and being physically aggressive with each other. Walpus testified that since January 2013, the girls have been asked to leave several daycares due to the aggression that was happening on a daily basis. In May, Walpus did a pretreatment assessment and mental status exam on both girls. Both girls were developmentally behind and showed signs of fetal drug exposure. Both girls had food issues (Victoria hoarded food and Lindsey refused to eat when anxious or distressed), speech issues (Victoria had a low vocabulary, Lindsey had a larger vocabulary but used it less), boundary issues (no stranger danger which was a safety issue), anger issues, dissociation, and anxiety. Lindsey also had sleep issues and nightmares. Lindsey's behaviors were more affected by schedule changes. Both girls were diagnosed with posttraumatic stress disorder (PTSD). Walpus testified that with the right tools and support, the girls should overcome their symptoms. Walpus said that the "right tools" would be therapeutic tools the parents could enlist from the integrated parenting class and therapy sessions, along with working on their relationship with each child and building trust. Walpus testified that the girls will need therapy at each developmental level they reach.

Walpus testified that in 2013, Christopher took an integrated parenting class and that his ability to recognize the social and emotional needs of the girls improved for a short period of time. However, Christopher was not able to retain the techniques and strategies he learned. For example, in November, Victoria was pushing Lindsey and Christopher failed to respond to Walpus' requests for him to redirect Victoria; Walpus had to redirect Victoria herself. In December, Christopher forgot how to do a nurturing activity that they had done at almost every session since May.

Walpus testified that in January 2014, Christopher fixated on the girls' behaviors that he viewed as sexual, like the girls kissing their foster parents, and thought the girls had been sexually abused while in foster care. Walpus testified that the girls were displaying normal developmental behaviors. She testified that she had to spend two sessions discussing the issue with Christopher.

Walpus testified that in February 2014, Christopher had not made progress in understanding the girls' social and emotional needs. During a session, the girls would be exhibiting anxiety related behavior, but Christopher was not able to recognize the cues beforehand. Walpus had to redirect him or point out the cues two to three times per session. Walpus stated that a child who has had trauma is "emotionally disregulated" and needs a parent to help regulate them. Walpus worked with Christopher on a parenting strategy called a "time-in," wherein the parent works with the child to help them though the anger or sadness or any big display of emotions to help comfort and soothe the child. However, Christopher was not able to demonstrate the skill learned at one session at a subsequent session. In February, Walpus recommended Christopher's visits be

supervised due his generalized lack of parenting skills and his inability to utilize the skills learned in therapy.

Walpus testified that in March 2014, Christopher made progress in being able to understand the twins' social and emotional needs. He took a more independent role with the activities and encouraged the girls more during the therapy sessions. Walpus still had to provide guidance about once each session, usually on the parenting strategies for acting out behaviors. Walpus testified that Christopher can independently parent the girls about 90-percent of the time during sessions, but that based on her review of the visitation reports, he could not consistently replicate skills at visitations; for example when the girls had temper tantrums or meltdowns, Christopher had difficulties calming and soothing the girls and then addressing the behavior. Walpus testified that it is concerning that Christopher cannot consistently replicate skills during visitations because the girls need stability and consistency in their parenting strategies; Walpus teaches Christopher and the foster parents the same strategies so that everyone is using the same method.

Walpus testified that she still has to reteach Christopher skills that he has already learned in therapy at least once each session. It was concerning to her that after a year Christopher had not developed a consistent and stable skill set. She testified that Christopher was currently unable to appropriately parent the girls with their special needs. Walpus testified that she has observed about 50-percent bonding behaviors between Christopher and the girls; there were still insecure attachment behaviors and a misunderstanding of emotional cues and needs.

Tracy O'Connell of Nebraska Families Collaborative was assigned as the family permanency specialist for this family from April to September 2013; in September 2013 she became the family permanency specialist supervisor for this case.

O'Connell testified that the girls underwent genetic testing and evaluation because there was a concern that they had fetal alcohol syndrome, but findings showed that they do not. Victoria and Lindsey had delayed motor and communication skills. Starting in 2012, the girls received educational services through Omaha Public Schools, Elkhorn Public Schools, and Bellevue Public Schools to work on sharing and appropriate behaviors, using words rather than being physical, improving communication, and teaching them how to calm themselves.

O'Connell testified that there were safety concerns regarding Christopher. In June 2013, Christopher and the girls were playing outside when one of the girls wandered out of sight; Christopher did not notice that the child had wandered away until the visitation worker pointed it out to him. Also that summer, the girls were in a small pool filled with a couple inches of water on the porch. Christopher was going to go inside to use the restroom when the visitation worker asked him "Do you think you should go with the children near the pool?" Christopher's response was "Do you think I should go?" Accordingly, O'Connell testified that there was a safety risk to the girls if Christopher was not supervised.

O'Connell testified that Christopher fixates on certain aspects of the girls' behaviors. For instance, in January 2014, Christopher was concerned that the girls had inappropriate sexual behaviors; Lindsey attempted to unzip the zipper on his pants and Victoria placed her head in his lap. Christopher requested that the girls receive services at Project Harmony. He also called the DHHS hotline multiple times. Christopher was still concerned even after he was told that the girls' behaviors were considered developmentally appropriate (e.g. Christopher's zipper was at Lindsey's eye level and she wanted to practice her zipping skills).

O'Connell testified that the girls had been diagnosed with failure to thrive early on in this case. The girls were underweight and had to supplement their diets with PediaSure to increase their caloric intake so that they would gain weight. The girls required structured eating times so that they would get adequate calories. However, Christopher allowed the children to "graze eat" rather than having regular meals, which inhibited their caloric intake. At the time of trial, Victoria was within one pound of her desired weight and was no longer required to take PediaSure; Lindsey was still underweight.

O'Connell testified that Christopher demonstrates love for his daughters and there is a bond. However, O'Connell testified that despite all of the parenting classes, his participation, and compliance with court orders, Christopher has not demonstrated a consistent understanding of the girls' developmental needs, communication needs, or age appropriate behaviors. O'Connell testified that termination of Christopher's parental rights was in the girls' best interests.

Asia Grimm, a family permanency specialist, has been the girls' caseworker since September 2013; this was around the same time the court ordered Christopher's visits changed from supervised to semi-supervised. Grimm testified that in January 2014, she recommended going back to supervised visits after she received multiple calls from the girls' daycare provider regarding concerns for how they were behaving upon returning from visits; the girls regressed in their potty training and misbehaved upon returning to the structured environment of daycare or the foster home (Christopher let the girls run the house, was not strict with them, and did not enforce any rules or boundaries, or provide redirection). O'Connell, Grimm's supervisor, testified that when Christopher's visits were semi-supervised, the girls' behaviors were exacerbated when they got back to daycare; there was more hitting, tantrums and physical aggression. The foster parents had the same concerns and observations of the girls' behaviors upon returning from semi-supervised visits.

Jessica Monahan is the director of the childcare center the girls attend. Monahan testified that the girls are gone from 8:30 a.m. to 11:30 a.m. or 12 noon on Mondays, Wednesdays, and Fridays for visits with Christopher. She testified that the girls used to have meltdowns after visits. Lindsey would scream in time-out, and she would punch and kick the walls. Victoria would get angry, pull other children's hair, and would punch and kick walls. Monahan, who testified in June 2014, stated that in the past few months the girls' behavior had improved and they were easier to redirect.

Melissa O. has been the girls' foster mother since June 2013. From June to August 2013, Christopher had supervised visits with the girls for 4 hours on Mondays, and 6 hours on Wednesdays and Fridays. Melissa testified that the girls came back from visits extremely exhausted (and would fall asleep while eating dinner), were defiant and "super aggressive." She testified that Victoria would bite and would throw objects; Lindsey would pull hair, hit, and kick. Starting in August 2013, Christopher had visits with the girls on Mondays, Wednesday, and Fridays for 2 hours each day. When the visits were shortened, the girls were less tired and defiant. However, Melissa testified that from October 2013 to March or April 2014, the visits were only semi-supervised and during this time the girls were harder to redirect, threw tantrums if told "no," and ate less (a concern because the girls were underweight). Melissa testified that in March or April 2014, Lindsey started having night terrors two to three times per night, five nights a week. Melissa testified that Victoria has night terrors as well. In order to calm the girls down, Melissa

has followed Walpus' recommendation to use compression blankets, instrumental music, and nightlights.

In a court report authored by Grimm in March 2014, she was still recommending supervised visits due to the regressive behaviors of the girls after semi-supervised visits. In her report she said

The lack of structure and rules, and [Christopher's] over focus on behaviors (i.e. sexualized behaviors) creates a stressful and anxious environment for the girls' [sic]; therefore, resulting in misbehaviors when they return to an environment, such as daycare, where there are rules, expectations, positive communication and structure.

Grimm testified that Walpus was "on board" with the recommendation of supervised visits. During a team meeting around May 2014, Christopher stated that he let the girls run the house; Grimm talked to Christopher about the need for structure so that the girls would not be confused about the rules at his house versus everywhere else.

Grimm testified that Christopher had complied with all court orders. There were no concerns with his medication compliance or his ongoing sobriety. Grimm testified that Mikaela Posekany, a visitation and family support worker from the Nebraska Children's Home Society, discharged Christopher from family support in January 2014 because the sessions had become stagnant. The discharge from family support services was considered a successful discharge because it appeared that Christopher had reached his maximum capacity to understand the subject matter; but issues continued to be addressed in family therapy. Grimm was concerned about Christopher's ability to internalize what he was taught and his ability to make changes and she was unaware of any other services to offer him.

Grimm testified that Christopher showed love and care for the girls, but still required a lot of support and guidance from professionals and was unable to consistently follow through with consequences for the girls. Grimm said that it was concerning that they were still at supervised visits nearly four years into the case. Grimm testified that the girls had been out-of-home for nearly 4 years and there had been little to no progress by Christopher on his ability to independently parent the children; he still needed constant redirection and supervision. She testified that the girls are "high need" because of their weight issues and PTSD; they need structure and follow-through and Christopher is not able to provide such at this time. Grimm testified that the girls need permanency and that terminating Christopher's parental rights would be in their best interests.

Leanette Norviel-Oltman is a visitation specialist and family support worker at Nebraska Children's Home Society. She has worked with Christopher since early 2014 as a visitation specialist; she does not provide family support for him. Norviel-Oltman supervised one visit per week and had not had any safety concerns. She testified that Christopher showed affection for the girls. She also testified that the girls showed excitement for visits and she believed the girls were "very bonded" to Christopher. Norviel-Oltman testified that Christopher had made progress in his parenting techniques (e.g. he now used time-outs when the girls misbehaved) and she had never had to redirect him. Both Norviel-Oltman (in early 2014) and Posekany (in late 2013) talked to Grimm about extending visits so as to get a clearer view of Christopher's parenting skills, but visits were not extended. O'Connell, Grimm's supervisor, testified that she did not approve extended

visits as they already knew extended time was disruptive to the girls, they had regressive behaviors, and that Christopher was not able to provide structure.

Visitation reports from April to July 2014 state that Christopher was making "moderate" progress. He had difficulty telling the girls "no," and said that the girls could control him. There were concerns about Christopher's ability to understand the girls' emotional needs. Visitation notes from August and September 2014 reveal no safety concerns and were positive overall.

In its order filed on October 28, 2014, the juvenile court terminated Christopher's parental rights to Victoria and Lindsey pursuant to § 43-292(2), (6) and (7), and found that termination was in the children's best interest.

We note that in June 2014, Christopher filed a "motion to continue visitation," asking the court to "enter an order authorizing him to participate in supervised visitation" with Victoria and Lindsey in the event that his parental rights were terminated. In its order filed on October 24, the court granted Christopher's motion and found that his supervised visitation with the children should continue in the event that the court issued an order terminating his parental rights.

Christopher has timely appealed the termination of his parental rights.

ASSIGNMENTS OF ERROR

Christopher assigns that the juvenile court erred in: (1) finding the children came within the meaning of § 43-292(2), (6), and (7); and (2) determining that it would be in the best interests of the children to terminate his parental rights.

STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Joseph S. et al.*, 288 Neb. 463, 849 N.W.2d 468 (2014). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Christopher's parental rights to Victoria and Lindsey, the juvenile court found that Christopher substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection (§ 43-292(2)); having determined that the children were juveniles as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the determination (§ 43-292(6)); and the children had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

The children were removed from the parental home in November 2010. At the time the operative motion to terminate parental rights was filed on March 10, 2014, the children had been

in an out-of-home placement for more than 39 months. At the time the termination hearing began in June 2014, the children had been in an out-of-home placement for 43 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Christopher's parental rights under § 43-292(7) were proven by sufficient evidence.

We need not consider whether termination of Christopher's parental rights was proper pursuant to § 43-292(2) or (6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Sir Messiah T. et al.*, *supra*. Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* As stated by the Nebraska Supreme Court in *In re Interest of Nicole M.*, 287 Neb. 685, 704-05, 844 N.W.2d 65, 80 (2014):

> There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. In discussing the constitutionally protected relationship between a parent and a child, we have stated that ""'"[p]arental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing."'" The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

*In re Interest of Nicole M., supra*, involved a father with similar issues to Christopher. The two girls in *Nicole M.* were removed from the parental home due to unsanitary living conditions. The girls' parents, Brandy and Tom, lived together but were not married. After the children were placed in foster care, it was learned that the children had been physically abused by Brandy, and had been sexually assaulted by Brandy's friend. There were concerns as to whether Tom could protect the children from unsafe situations and whether he could parent the girls on his own. Tom had a full-scale IQ in the below-average/borderline range, which

> would suggest that Tom will have some difficulty with understanding multistep directions and complicated instruction. It will be important to double check that Tom has a clear understanding of what is expected of him prior to making the assumption that he understands.

*In re Interest of Nicole M.*, 287 Neb. at 695-96, 844 N.W.2d at 75. The therapist who performed Tom's testing, testified that Tom's "day-to-day functioning was really quite adequate. He got up everyday, he'd go to work. . . . He made sure bills were paid, he came home. . . . [H]e was doing all the basic daily living skills." *Id*. at 696, 844 N.W.2d at 75. The therapist had no concerns about Tom's ability to function, but indicated that "it would be difficult for him to be on his own with his kids. . . . I would have some reservations and I would say that he would need a fair amount of support. . . ." *Id*. Tom's profile indicated he tended to be a "victim" of his mate's behavior, allowing his first wife to verbally and physically abuse him and then allowing Brandy to verbally abuse his daughters; Tom stayed with Brandy because he questioned if he could raise the girls on his own. There were no concerns about Tom harming the children. Tom was able to provide proper parenting upon occasion, but not consistently, and it took him awhile to show that he could be consistent with rules and consequences. There were concerns that the children would act in ways that Tom would be unable to handle, including tantrums, fighting, trouble getting out of bed in the morning, and bed-wetting. But all of the evidence showed that the children loved Tom and no one expressed any concern about the children's safety around Tom. At the termination hearing, Tom testified that he would leave Brandy in order to have the children in his home, and he testified that with family support, he could raise the children by himself. The county court, sitting as a juvenile court, terminated Tom's parental rights.

On appeal, the Supreme Court concluded that the county court erred in its implicit finding that Tom was unfit and accordingly reversed the county court's termination of Tom's parental rights. The Supreme Court said:

> Tom's psychological profile provides that "Tom will have some difficulty understanding multistep directions and complicated instruction. It will be important to double check that Tom has a clear understanding of what is expected of him prior to making the assumption that he understands."
>
> Tom suffers from an adjustment order, apparently due to the removal of his children from the home. His intelligence is borderline/below average. His profile indicates that he is a "victim." His parenting skills are inconsistent, and he is described as "weak" and "soft." Tom appears to be overly optimistic about Brandy's ability to change, to the extent that he denies her bad behavior unless directly presented with it.
>
> But still, Tom functions on a day-to-day basis. He has a job and pays the bills. He loves the children, and they love him. . . . there are no concerns by anyone that Tom would physically harm the children. Tom now indicates that he is willing to leave Brandy so that he can parent the children on his own, and the evidence presented in the record suggests that, with help, he is capable of doing so.
>
> Tom is not a perfect parent. But as we have often emphasized, perfection of a parent is not required. We conclude that the State did not rebut the presumption that Tom is a fit parent. As such, the county court erred in terminating Tom's parental rights.

*In re Interest of Nicole M.*, 287 Neb. 685, 711, 844 N.W.2d 65, 84 (2014). Because the Supreme Court found that Tom was a fit parent, they did not address whether statutory grounds for termination were shown, or whether termination was in the children's best interests.

Similar to the facts in *In re Interest of Nicole M., supra*, Christopher's intellectual functioning was in the low average range, but he was able to function on a day-to-day basis. Christopher and his children love one another and have a bond. And, like in *Nicole M.*, there were concerns about Christopher's ability to independently parent the girls. However, *Nicole M.* is distinguishable from the instant case. In *Nicole M.*, the State sought to terminate Tom's parental rights 2 years after removal; in the instant case, the operative motion to terminate Christopher's parental rights was not filed until 3½ years after removal, giving Christopher significantly more time to "learn" how to parent. In fact, Christopher was provided ongoing family therapy with his children in order to help him improve his parenting abilities; a factor not present in the *Nicole M.* case. Both Victoria and Lindsey have special needs; they were developmentally behind, showed signs of fetal drug exposure, were diagnosed with PTSD, and had ongoing anxiety and behavioral issues. Christopher was provided ongoing family therapy with his children for more than a year during which time he was taught techniques and strategies for parenting the girls and dealing with their special needs; however, despite such ongoing services, Christopher had difficulty retaining the techniques and strategies he learned. Thus, while the court in *Nicole M.* found that with help, Tom was capable of parenting his children on his own, such does not appear to be true in Christopher's case as will be discussed further below. The children were originally removed from Christopher because of domestic violence between Christopher and the girls' mother in the presence of the children, and because of parental drug use. It is undisputed that Christopher loves his children and is bonded to them. It is also undisputed that Christopher had complied with all court-ordered services. However, the majority of the witnesses agree that despite those services, Christopher was still not able to independently parent Victoria and Lindsey, who have special needs.

Victoria and Lindsey have been diagnosed with failure to thrive and were underweight; although at the time of the termination hearing, Victoria was within one pound of her desired weight. Despite being informed that the girls needed structured meal times to attain the necessary calories, Christopher allowed them to "graze eat." O'Connell testified that there are safety concerns with Christopher. He has failed to notice when a child wandered out of sight, and if not for the intervention of a visitation worker, would have left the children unattended in a small pool (even though the pool only had a couple inches of water in it, it still posed a safety risk).

Christopher has fixated on certain developmentally appropriate behaviors of the girls that he deemed sexual, despite assurances that the behaviors were not sexual. Christopher repeatedly questioned the girls about those behaviors which caused anxiety related responses.

Walpus testified that both girls were developmentally behind and have anger and anxiety issues. Both girls also have PTSD. As stated by the juvenile court, "Both children have rather significant behavioral problems and are difficult to manage." Christopher admitted that the girls run the house and control him. Numerous witnesses testified that when Christopher had extended or semi-supervised visits, the girls' behaviors were exacerbated afterwards; there was more hitting, tantrums and physical aggression. Walpus worked with Christopher on strategies and techniques for addressing the girls' behavioral issues. She also worked with him on identifying the girls' emotional cues and using nurturing techniques when the girls exhibited anxiety behaviors. However, Christopher was not able to retain the techniques and strategies he learned. Walpus testified that Christopher can independently parent the girls about 90-percent of the time during

sessions, but that based on her review of the visitation reports, he could not consistently replicate skills at visitations. Walpus said it was concerning to her that after a year Christopher had not developed a consistent and stable skill set. She testified that Christopher was currently unable to appropriately parent the girls with their special needs.

Fairbanks stated that Christopher appeared to have gone through the motions of all that had been asked of him by the court, but appeared to lack insight and judgment for independent parenting abilities.

Christopher lacked overall progress in his ability to independently parent Victoria and Lindsey. Numerous witnesses testified that Christopher has not demonstrated a consistent understanding of the girls' developmental needs, communication needs, or age appropriate behaviors. And as stated previously, Walpus testified that Christopher was unable to appropriately parent the girls at this time. Grimm testified that the children need permanency. Both Grimm and O'Connell testified that it is in the children's best interest to terminate Christopher's parental rights. We agree.

We acknowledge that visitation reports from August and September 2014, were positive; however, those visits occurred during the middle of the termination hearing and nearly 4 years after the girls were removed from the parental home; it was simply too little progress too late. At the time of the termination hearing, Victoria and Lindsey had been in an out-of-home placement for nearly 4 years, and Christopher was still not able to independently parent the girls. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). The children need a safe, permanent home, and unfortunately Christopher cannot provide them with such. After our de novo review, we find that Christopher is an unfit parent and it is in the children's best interest that Christopher's parental rights be terminated.

We acknowledge that Christopher and his children love one another and are bonded. Therefore, we are appreciative of the fact that the juvenile court granted Christopher continuing supervised visitation with the children in the event that his parental rights were terminated.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Christopher's parental rights to Victoria and Lindsey.

AFFIRMED.