IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF PRECIOUS H. & BLUT LAW LA H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF PRECIOUS H. AND BLUT LAW LA H.,

CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLANT,

V.

WAH P., APPELLEE.

Filed January 26, 2016.   No. A-15-675.

Appeal from the Separate Juvenile Court of Douglas County: PATRICIA A. LAMBERTY, District Judge, Retired. Affirmed.

Donald W. Kleine, Douglas County Attorney, Cortney Wiresinger, and Megan Furey, Senior Certified Law Student, for appellant.

Ashley L. Albertsen, of Oestmann & Albertsen Law, P.C., L.L.O., for appellee.

Maureen K. Monahan, guardian ad litem.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

The State filed a motion to terminate the parental rights of Wah P. to her children Precious H. and Blut Law La H. (Blue). After a hearing, the separate juvenile court for Douglas County dismissed the State's motion to terminate Wah's parental rights; it could not find by clear and convincing evidence that terminating Wah's parental rights would be in the children's best interests, safety, and welfare. The State appeals. For the reasons that follow, we affirm.

- 1 -

BACKGROUND

Wah is the biological mother of Precious, born in August 2013, and Blue, born in May 2014. The name of Precious' biological father does not appear in our record; because he is not part of the appeal, he will not be discussed any further. Tah H. is the biological father of Blue. Tah's parental rights to Blue have been terminated and he is not part of this appeal; therefore, we will discuss Tah only as necessary.

In October 2013, the State filed a petition alleging that Precious was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) due to the faults or habits of Wah. The State alleged that (1) Wah engaged in domestic violence, (2) Wah had a history of domestic violence, (3) Wah failed to protect Precious from domestic violence, (4) Wah failed to provide Precious with safe, stable, and/or appropriate housing, (5) Wah failed to provide proper parental care, support, and/or supervision for Precious, and (6) due to the above allegations, Precious was at risk for harm. The State also filed for immediate temporary custody of Precious. The State's affidavit for removal stated that Wah had slapped 2-month-old Precious, leaving bruises on her buttocks and back, and that Wah and her boyfriend, Tah, had a history of severe domestic violence for the past year. The court granted immediate temporary custody of Precious to the Department of Health and Human Services (DHHS) for placement in foster care or other appropriate placement to exclude the home of Wah. Precious has remained in the custody of DHHS ever since. In November, Wah was awarded reasonable rights of supervised visitation. Wah was also ordered to notify the court, her attorney, and DHHS in writing of any change of address, phone number, and/or place of employment within 48 hours of said change; timely notify the court of any services she deemed necessary to assist with the return of the children to the parental home; and make reasonable efforts on her own to bring about rehabilitation.

In January 2014, the State moved for a court order allowing Wah's visits with Precious to transition from supervised to semi-supervised, with a plan to ultimately transition to unsupervised visits and then placement with Wah. The court granted the State's motion for liberalized visitation.

In May 2014, two weeks after Blue's birth, the State filed a supplemental petition alleging that Blue was a child as defined by § 43-247(3)(a) due to the faults or habits of Wah; Blue was still in the hospital at the time. The State also filed for, and was granted, immediate custody of Blue. Subsequent orders in May and June noted that Wah had not been served with the supplemental petition and she had not appeared for the scheduled hearings; the court said that if service was not obtained and/or further action requested by the State, the matter would be dismissed. In July the court found that the State had not requested further action and ordered the supplemental petition to be dismissed without prejudice.

On July 16, 2014, the State filed a second supplemental petition alleging that Blue was a child as defined by § 43-247(3)(a) due to the faults or habits of Wah; Blue was still in the hospital at the time. The State alleged that (1) notwithstanding services offered to Wah, for Precious, on a voluntary basis, Wah had failed to follow through with services designed to allow Precious to return back home; (2) Wah had an active protection order of which she was in violation; (3) Wah failed to provide Blue with safe, stable, and/or appropriate housing; (4) Wah failed to provide proper parental care, support, and/or supervision for Blue; and (5) due to the above allegations, Blue was at risk for harm. That same day, the State filed a "Motion for Temporary Custody" of

Blue (file stamped at 3:25 p.m.) and a "Second Motion for Temporary Custody" of Blue (file stamped at 3:24 p.m.). In an "Order" file stamped that same day at 3:23 p.m., the court overruled the State's ex parte motion for temporary custody of Blue, but then in an "Order for Immediate Custody" file stamped at 3:24 p.m., the court ordered DHHS to take custody of Blue for placement in foster care or other appropriate placement to exclude the home of Wah. Both motions and both orders were filed within a matter of two minutes, and do not appear to have been file stamped in the proper sequence--e.g., the orders were filed prior to or simultaneously with the motions, and the "Second Motion for Temporary Custody" was filed before the initial "Motion for Temporary Custody." Despite the filing irregularity, it is apparent that the court's order overruling the State's initial motion for temporary custody, while file stamped on July 16, appears to have been signed by the court on July 15. And notably, the State's affidavit attached to and incorporated in the initial motion for temporary custody contains less information than the State's affidavit attached to and incorporated in the later "Second Motion for Temporary Custody." Although somewhat confusing because of the multiple, inaccurately sequenced filings that took place within a matter of minutes, it can be determined that the court's order allowing DHHS to take custody of Blue was signed and filed on July 16 after the court was presented with a more detailed affidavit to support the "Second Motion for Temporary Custody."

In an order filed on July 29 regarding a "first appearance and protective custody hearing" with respect to the second supplemental petition (the proceedings of which do not appear in our record), the court ordered DHHS to provide "notice to the father(s) of the children's temporary custody" with DHHS and placement into foster care. And in an order filed on August 14 regarding a "first appearance and protective custody hearing with respect to the supplemental petition concerning [Blue] and his mother" (the proceedings of which do not appear in our record), the court stated that a hearing was held on the State's motion for continued detention of Blue, and that based on the evidence it was in Blue's best interests, safety, and welfare to remain in the temporary custody of DHHS for appropriate care, education, and maintenance, to exclude the parental home. Pursuant to the August 14 order, Wah was awarded reasonable rights of supervised visitation with Blue.

Although the proceedings do not appear in our record, in September 2014, the juvenile court adjudicated Precious and Blue to be within the meaning of § 43-247(3)(a) due to the faults or habits of Wah. However, the court dismissed the counts in the original petition alleging that Wah engaged in domestic violence and that Wah failed to protect Precious from domestic violence. The court also dismissed the count in the second supplemental petition alleging that Wah had an active protection order of which she was in violation. The court ordered the children to remain in the temporary custody of DHHS for appropriate care, services, and placement, to exclude the parental home. Pending disposition, Wah was ordered to (1) obtain and maintain safe, stable, and adequate housing; (2) obtain and maintain a legal, stable source of income; (3) complete an updated pretreatment assessment as arranged by DHHS; (4) cooperate with DHHS with respect to locating a natural support system within the community and/or family; (5) timely notify the court of any services she deemed necessary to assist with return of the children to the parental home; and (6) notify the court, her counsel, and DHHS in writing of any change of address and phone number within 48 hours of said change.

In November 2014, a disposition hearing was held (the proceedings of which do not appear in our record). In its order, the court ordered Precious and Blue to remain in the temporary custody of DHHS for appropriate care, maintenance, services, and placement, to exclude the parental home. The court stated that the permanency objective was reunification with a concurrent plan of adoption. The court found that no further reasonable efforts were required because Wah's whereabouts had not been known since April, and she had had no visitation with Precious since April or with Blue since June.

On April 6, 2015, the State filed a motion for termination of Wah's parental rights to Precious and Blue pursuant to Neb. Rev. Stat. § 43-292(1), (2), (6), (7), and (9) (Cum. Supp. 2014). The State alleged that: Wah had abandoned the children for 6 months or more immediately prior to the filing of the petition; Wah substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection; reasonable efforts to preserve and reunify the family if required under § 43-283.01 had failed to correct the conditions leading to the adjudication; the children had been in out-of-home placement for 15 or more of the most recent 22 months; Wah subjected the children to aggravating circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination was in the children's best interests. The State further alleged that reasonable efforts under Neb. Rev. Stat. § 43-283.01 were not required because Wah subjected the children to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

The termination hearing was held on June 16 and 23, 2015. Testimony was given by the ongoing case worker, the foster mother, and Wah. It was established that Wah is originally from Thailand and her native language is Karen.

Kentavis Brice, a family permanency specialist with Nebraska Families Collaborative (NFC), provided ongoing case management services for DHHS. Brice was assigned to this family in November 2013. He testified as follows. Precious was placed with her foster family on October 31, 2013. Wah was provided translation services when the case started. Brice met with Wah monthly, but an interpreter was not used every time; at one point, Wah said she did not need an interpreter. During visits, Wah was able to communicate with Brice and the visitation specialist, and Brice did not sense any misunderstanding. On cross-examination, Brice said that he and Wah corresponded regarding basic things, but felt that for more complicated concepts, a translator was needed.

According to Brice, for a while in 2014, Wah engaged in services. She participated in family support, voluntarily completed a parenting class, completed domestic violence classes in early 2014, and had visits with Precious. Wah successfully completed supervised visits with Precious in March and transitioned to semi-supervised visits that same month. Wah's last semi-supervised visit with Precious was on April 21. Wah also stopped working with family support in April. Brice said that Wah also attended some ESL classes and participated in refugee case management services. (We note that besides visitation, Wah did not have any court-ordered services until the adjudication in September.)

Brice testified that Blue was born at Creighton hospital in May 2014 at 24 or 25 weeks gestation. The nurses told Brice that Wah had visited Blue. On June 20, Brice spoke with Wah over the phone. He reminded her that he was the caseworker and tried to explain to Wah that her visits with Blue needed to be supervised and that Blue's father could not be with Wah and Blue at

the same time due to an active protection order. Brice believed that Wah understood because she proceeded to "cuss [him] out" and hung up. However, Brice also testified that he felt Wah had difficulty understanding the visitation conversation and he wrote in his notes that he would call back with an interpreter who may be able to explain better. Brice could not recall if he called Wah back with an interpreter. According to Brice, Wah last saw Blue at Creighton hospital in July.

In July 2014, Blue was moved to Children's hospital. Wah did not visit Blue at Children's hospital. Brice testified that he was not able to give Wah notice that Blue had been moved to a different hospital because Brice could not find Wah and was not made aware of her whereabouts; he tried to call her twice. When Blue was released from Children's hospital on September 10, he was placed with the same foster family as Precious. Brice was not able to notify Wah of Blue's placement with the foster family upon release from the hospital; Brice attempted to contact Wah via phone. Although it is not clear whether Brice was talking about his attempts to call Wah regarding Blue's move to Children's hospital or his move to the foster family, Brice said that on one occasion, he got an error message saying that "'The party that you are trying to reach is not available,'" and on another occasion the message said "'The number that you are calling is no longer in service.'" Brice said he did not have Wah's address after March 2014. Brice looked Wah up on Facebook and sent messages to her via the site every month or two, but got no response; Brice posted his messages in English, although Wah's native language is Karen. Brice acknowledged that Wah had not given him her Facebook information, but the Facebook account Brice found had pictures of Wah and the children, so he assumed it was her account. On cross-examination, Brice acknowledged that at one point he was aware of where Wah worked, but admitted that he did not try to send letters to her at her workplace. Wah has not had visitation with Blue since he was in the hospital. And she did not attend Blue's medical appointments or surgeries; however, Wah was not aware of those appointments because Brice could not locate her.

Citing Wah's lack of participation in court-ordered services for "nearly over a year," Brice testified that it was in the children's best interests for Wah's parental rights to be terminated. Brice stated that Wah was not able to care for her children or provide them with the support that they needed.

Leanne M. is the children's foster mother and testified as follows. Precious was placed with her on October 31, 2013, and Blue was placed with her when he was released from the hospital on September 10, 2014. Wah had previously had three visits each week with Precious but started cancelling. Wah's last scheduled visit took place with Precious in April 2014. However, Wah stopped by the foster home unannounced on July 5, 2014, and February 22, 2015. Wah stayed for approximately 15 minutes during each of those unannounced visits and brought clothes for Precious each time; in July 2014, Wah also left some money, and in February 2015 she also brought a necklace. Wah did not call, nor did she send cards or letters to the children; although Leanne testified that Precious is very little and just learning phone skills. During the February visit, Wah did not recognize Blue; however, Leanne did not know if Wah had been informed that Blue had been placed in that foster home.

Leanne, a nurse, went through a lot of special training in order to care for Blue. She said that Blue has a "trach" that needs to be suctioned out. Blue also had numerous follow-up medical appointments. Wah never attended Blue's follow-up appointments and she was not present for Blue's surgeries; however, Leanne did not know if Wah had been notified of Blue's appointments.

- 5 -

During one of the unscheduled visits, Leanne tried to explain Blue's medical condition to Wah; she briefly explained that Blue breathed through a "trach" and that Leanne had to suction it out. Wah did not respond enough for Leanne to assess whether Wah understood. Leanne testified that Wah may have some difficulty understanding English; Wah was able to text back and forth regarding pick-ups for Precious, but Leanne said that difficult conversations could "probably be a problem." Leanne testified that it was in the children's best interest to terminate Wah's parental rights, but did not elaborate further.

Wah testified as follows. She started learning English when she came to "America" in 2010. An interpreter was provided for her during her first visit with Precious, but then it was just the visitation worker. Wah testified that she needs an interpreter because she does not "understand all English or speak all English." Wah said that sometimes Brice would call an interpreter, but after he took Blue he did not provide an interpreter. Brice never gave Wah the phone number for an interpreter and she did not know anyone that could help her with English if she did not understand. She also thought she needed to pay for an interpreter. Wah said that her phone number changed in 2014 because her phone broke, but she did not call Brice to give him her new number.

Wah visited Blue in the hospital. Her testimony is a little confusing. She said that one day she went to the hospital to bring milk and the doctor told her that she could not see Blue and that she had to call the NFC worker. Wah called the worker, but did not understand all of the conversation. Wah did not think she could see her son anymore. Wah said that Brice told her that Blue was at Children's hospital. However, she did not know the address of the hospital or how to get there, and she said she was not allowed to see Blue; she said that Brice never offered her visits.

But Wah also testified that she visited Creighton twice. She said that she called Brice after the first visit and he said that someone had to supervise her visits; Wah said she did not understand all of the conversation. Wah did not call Brice back, and even if she would have called him back she would not have understood. Wah said the second time she went to Creighton they told her that Blue was no longer there and that they did not give her the address for the other hospital.

Wah said that she thought she could see Precious, and she visited her in February; she did not know that Blue was at the same foster home. Wah testified that she went to see Precious "all the time, but I went to go, but like I said before, they won't allow me to see her. They won't open the door for me." Wah testified that she had a house, a job, and money. She wants her children to be with her.

In its order filed on June 25, 2015, the juvenile court stated that it "cannot find by clear and convincing evidence that terminating parental rights of Wah P[.] would be in the children's best interest, safety and welfare. Accordingly, the motion for termination of parental rights shall be dismissed."

The State has timely appealed.

ASSIGNMENTS OF ERROR

The State assigns that the juvenile court erred in (1) dismissing its motion to terminate Wah's parental rights as it "presented sufficient evidence to support termination under the alleged subsections of Neb. Rev. Stat. § 43-292" and (2) failing to find that termination of Wah's parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

Under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in the section have been satisfied and that termination is in the child's best interests. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent. *Id.*

A parent's right to raise his or her child is constitutionally protected; as such, before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

In the instant case, there was minimal testimony regarding best interests. Leanne testified that it was in the children's best interests to terminate Wah's parental rights, but did not elaborate further. And citing Wah's lack of participation in court-ordered services for "nearly over a year," Brice testified that it was in the children's best interests for Wah's parental rights to be terminated. Brice stated that Wah was not able to care for her children or provide them with the support that they needed.

Brice testified that Wah engaged in voluntary services prior to April 2014; she completed a parenting class and domestic violence classes. Wah also had scheduled visits with Precious and participated in family support until April 21. Brice said that Wah also attended some ESL classes and participated in refugee case management services. In the September 2014 adjudication order, the juvenile court stated that pending disposition, Wah was ordered to (1) obtain and maintain safe, stable, and adequate housing; (2) obtain and maintain a legal, stable source of income; (3) complete an updated pretreatment assessment as arranged by DHHS; (4) cooperate with DHHS with respect to locating a natural support system within the community and/or family; (5) timely notify the court of any services she deemed necessary to assist with return of the children to the parental home; and (6) notify the court, her counsel, and DHHS in writing of any change of address and phone number within 48 hours of said change. Wah testified that she had a house, a job, and money. Brice testified that Wah has completed some portions of a psychological assessment, but that

insurance authorization and interpreter services were needed to complete the remaining portions of the assessment; he acknowledged that those issues were out of Wah's control. It is true that Wah has failed to notify DHHS of any change in address and phone number. However, that can be attributed to communication difficulties. The evidence is clear that Wah has difficulty with the English language. Wah testified that Brice never gave her the phone number for an interpreter and she did not know anyone that could help her with English if she did not understand. She also thought she needed to pay for an interpreter.

Brice acknowledged that he did not always use an interpreter to communicate with Wah. He thought she could understand simple conversations, but also felt like an interpreter was needed for more complicated concepts. Leanne testified to the same. In fact, when discussing his phone call with Wah on June 20, 2014, wherein he tried to explain to Wah that her visits with Blue needed to be supervised and that Blue's father could not be with Wah and Blue at the same time due to an active protection order, Brice initially said he believed that Wah understood because she proceeded to "cuss [him] out" and hung up. However, Brice also testified that he felt Wah had difficulty understanding the visitation conversation and he wrote in his notes that he would call back with an interpreter who may be able to explain better; he could not recall if he called Wah back with an interpreter. Wah testified that when she went to see Blue at the hospital, she was told by the doctor that she could not see him. Wah talked to Brice about visitation, but did not understand the conversation. She thought she could no longer see her son.

Wah did think she could visit Precious. She said that she tried to visit her many times, but that no one would open the door for her. Leanne testified that she was never told by NFC to deny Wah visits with her children, but that it was up to Leanne's discretion. Wah did have two unscheduled visits with Precious in July 2014 and February 2015.

At the conclusion of the termination hearing, the juvenile court stated

These cases are really tough. . . .

But I'm not going to find the rights to mom be terminated. Clear and convincing evidence is a tough burden. And it's got to be really firm facts. I'm a little concerned about the interpretation and the English versus the Koran [sic].

There is no question that there can be a continued disposition hearing on the abuse and neglect, and there would have to be dramatic changes in terms of mom's involvement, or we'll be back here again.

. . . .

But as of today, I'm not going to find by clear and convincing evidence that her rights should be terminated.

And in its order, the court said it "cannot find by clear and convincing evidence that terminating parental rights of Wah P[.] would be in the children's best interest, safety and welfare. Accordingly, the motion for termination of parental rights shall be dismissed." We agree.

While Wah has not been a perfect parent, it is clear that a lot of her shortcomings in this case can be attributed to a language barrier. And it is also clear that DHHS and NFC failed to provide her with the appropriate interpreter services. Termination of parental rights is not to be taken lightly. Wah's right to raise her children is constitutionally protected, and before terminating that right, the State must show by clear and convincing evidence that Wah is unfit and that it is in

the children's best interests to terminate her rights. After our de novo review of the record, we find that the State failed to meet its burden of proof. Accordingly, the juvenile court properly dismissed the motion to terminate Wah's parental rights.

Because the State did not prove unfitness or best interests, we need not address whether statutory grounds for termination were shown. See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014) (an appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it).

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order dismissing the State's motion to terminate Wah's parental rights.

AFFIRMED.