IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF BREANNA E. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF BREANNA E. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MEGAN E., APPELLANT.


Filed August 22, 2017.    No. A-17-058.


Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Matthias J. Kraemer for appellant.

Donald W. Kleine, Douglas County Attorney, and Kati M. Kilcoin for appellee.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

Megan E. appeals from the decision of the separate juvenile court of Douglas County which terminated her parental rights to her four children. We affirm.

BACKGROUND

*Procedural Background.*

Megan is the mother of La Rissa E., born in 2005; Breanna E., born in 2008; Patience E., born in 2015; and Floyd E., born in 2016. Robert S. is the biological father of La Rissa, but he relinquished his parental rights to her in October 2016. Because Robert is not part of this appeal, he will not be discussed any further. The father(s) of the other three children are not clearly identified in our record or are otherwise unknown.

- 1 -

La Rissa, Breanna, and Patience were removed from Megan's care and custody in February 2015. The basis of the removal was that Megan had just given birth to Patience, and both mother and baby tested positive for methamphetamine. All three children were placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and into foster care where they have remained.

In February 2015, the State filed an amended petition alleging that La Rissa, Breanna, and Patience were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014) because they lacked proper parental care by reason of the faults or habits of Megan, in that: (1) Patience "tested positive in her urine drug screen"; (2) Megan's use of alcohol or illegal drugs placed the children at risk of harm; (3) Megan failed to provide appropriate care, support, and/or supervision for the children; and (4) due to the above allegations, the children were at risk for harm.

An adjudication and disposition hearing was held in March 2015. La Rissa, Breanna, and Patience were adjudicated to be within the meaning of § 43-247(3)(a) after Megan admitted that Patience "tested positive in her urine drug screen," Megan's use of alcohol or illegal drugs placed the children at risk of harm, and due to the above allegations, the children were at risk for harm. The allegation that Megan failed to provide appropriate care, support, and/or supervision for the children was dismissed on the State's own motion. The juvenile court stated that the permanency objective was reunification with a concurrent plan of adoption. The court ordered Megan to (1) have supervised visitation, (2) immediately enroll in dual-diagnosis outpatient treatment to address issues of substance abuse and mental health, and follow all aftercare recommendations, (3) not use alcohol or drugs, (4) submit to random urinalysis testing (UAs), (5) participate in a sobriety support group, (6) maintain safe and adequate housing and a legal source of income, (7) provide monthly verification to the case manager that she is maintaining housing and income, and (8) at no time allow sex offenders or any individuals on the State's Central Registry to be in the children's presence, or allow any other individuals that she knows to be inappropriate to be in the presence of the children.

Review and permanency hearings were held in September 2015, and in March and September 2016. Pursuant to the March 2016 order, Megan was to refrain from discussing the case with the minor children during visits, or otherwise having inappropriate conversations with the children.

In September 2016, Megan gave birth to Floyd, and both mother and baby tested positive for methamphetamine. Floyd was placed in the care and custody of DHHS and into a foster home where he has remained. Megan was allowed to have supervised visits with Floyd.

On September 9, 2016, the State filed a motion for termination of Megan's parental rights to La Rissa, Breanna, and Patience pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Megan substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; the children had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

That same day, the State also filed a "Second Supplemental Petition and Termination of Parental Rights" alleging that Floyd was a child as defined by § 43-247(3)(a) (Reissue 2016),

because he lacked proper parental care by reason of the faults or habits of Megan, in that: (1) Megan's use of alcohol and/or controlled substances placed the child at risk of harm; (2) Megan failed to provide proper parental care, support, supervision, and/or protection for the child; and (3) due to the above allegations, the child was at risk for harm. The State further alleged that Megan had substantially and continuously or repeatedly neglected and refused to give the child, or a sibling, necessary care and protection (§ 43-292(2)), and that termination of Megan's parental rights was in the child's best interests.

*Termination Hearing.*

A hearing was held on December 19, 2016, to determine whether Megan's parental rights should be terminated to the three girls. This was also a combined adjudication/termination hearing for Floyd. A summary of the evidence follows.

Margaret Davidson is a licensed independent mental health practitioner. She testified that she began seeing La Rissa and Breanna in early 2015 and met with them weekly though the time of the hearing. The girls had already undergone a diagnostic evaluation by Dr. Charles Muiu, and Davidson relied on the evaluation in formulating a treatment plan for the girls; it is unclear whether La Rissa and Breanna underwent separate diagnostic evaluations or whether only one joint evaluation was conducted. Both girls had trust issues because "their whole environment had been changed."

Breanna had been diagnosed with attention deficit disorder, and Davidson is working with her on "impulsivity and understanding [her] emotions and how to express them correctly." Breanna is "more closed off," which is concerning "[b]ecause she's not talking about what's happening to her." "In the last couple of sessions," as Davidson and Breanna talked about what was happening in her life "with the court system and with the possibility of her . . . mother's rights being terminated," Breanna "crawl[ed] underneath the table into the fetal position and start[ed] to cry and shut down on [Davidson]."

Breanna also discussed visitations with Davidson. The girls usually enjoy their time with Megan, but the last visit there was some concern; Breanna said they went to the library and Megan got "really angry and was yelling" and a security guard asked them to leave. Breanna felt like the library incident was her fault because "[w]e weren't behaving, we weren't doing what we were supposed to be doing, and Mom got angry at us."

Davidson testified that Breanna needs permanency because "she feels very insecure in who she is in her life, and she needs stability. She needs to know what's going to happen next." Right now it is like a "roller coaster ride" of hope and disappointment. As a result, "it's impossible for [Breanna] to really become stable in who she is and feel secure and connected, and children need to feel a connection."

La Rissa has also been diagnosed with attention deficit disorder. Initially, Davidson worked with her on impulsivity and understanding emotions, but they are now looking at understanding coping skills and getting "healthy" skills rather than a "maladaptive one." La Rissa's coping skill is to "shut down and close off," so Davidson wants her to feel like she can safely express what she is feeling and experiencing.

La Rissa also told Davidson about the recent library incident during a visitation. She said "[w]e were a little rowdy" and "getting a little carried away." Megan yelled, and a "security guard came over." While she was yelling, Megan said that it was La Rissa and Breanna's fault that they were in foster care. In earlier sessions with Davidson, La Rissa shared that sometimes when she would go on visitations she would have to make sure everything was okay in the house, and she used to hide her mom's "pipe."

After attending one court hearing, La Rissa expressed a lot of anger about Megan because La Rissa was under the impression that Megan had been doing what she was supposed to be doing, but found out that was not true; La Rissa said, "She lied to me." Davidson and La Rissa have discussed the pending termination of Megan's parental rights. La Rissa is "very open and understanding of it" and "she knows that it's . . . a strong possibility." La Rissa does have "some hope that things will be okay," and that Megan will accomplish what she needs to accomplish.

Davidson testified that La Rissa "very much" needs permanency because in the past two years of therapy, La Rissa "started to develop a sense of self-worth by being in a secure environment and understanding . . . what the world really is like in a family-type setting." La Rissa has talked openly about being adopted.

On cross-examination, Davidson stated that both Breanna and La Rissa love and miss Megan.

Brianna Pickering was the family permanency specialist assigned to this case from October 2015 to November 2016. Pickering testified she reviewed the case file when she took over the case. La Rissa, Breanna, and Patience became state wards immediately following Patience's birth in February 2015, because Patience tested positive for methamphetamine at the time of her birth, and there were concerns that the older children's basic needs were not being met. Floyd became a state ward immediately following his birth in September 2016, because he tested positive for methamphetamine at the time of his birth; although Megan admitted to drinking alcohol a few days before the birth, she denied using methamphetamine. None of the children have returned to Megan's care.

Pickering testified as to Megan's progress in this case. Prior to Pickering's time on this case, Megan had completed a chemical dependency evaluation in March 2015, and had also completed an initial diagnostic interview; both evaluations recommended Level 1 dual-diagnosis treatment. The previous caseworker made a referral to the Stephen Center Hero Program, and Megan had attended treatment, but had not completed treatment because she still needed to attend 16 "AA" or "NA" meetings and submit documentation to the program showing that she had attended those meetings. Megan was submitting to UAs several times a week with Heartland Family Services and completed about 85 percent of her tests. Megan was also participating in visitation. At the time Pickering took over the case in September, Megan was making "fair" progress.

Pickering authored two court reports for this family: the first was in March 2016, received into evidence as exhibit 25; and the second was in August, received into evidence as exhibit 35.

At the time of the March 2016 report, Megan was making "fair" progress on the case. She was having supervised visits with the three girls; Floyd was not yet born. Pickering testified that she was concerned about Megan's inconsistent attendance because on average she missed about

25 percent of her visits. However, on cross-examination, Pickering agreed that the March report did not show that Megan missed 25 percent of visits, but instead showed she was doing "pretty well" having attended 105 out of 111 visits from September 2015 to February 2016 (another part of the report said she attended 106 out of 113 visits during that time). Pickering was also concerned about the topics being discussed with the children; La Rissa had reported that the case was being discussed during visits, and that it made her uncomfortable. There were also some occasions when Megan and La Rissa would get into an argument, and the visit would be ended. The March report stated that there had been concerns of Megan getting verbally aggressive with her children and the visitation workers. During the reporting period, Megan did not attend sober support group meetings, claiming she was "too busy." She was not compliant with UA testing through Owens & Associates (the company took over Megan's drug testing in December 2015); at one point Megan claimed she was not getting calls from Owens & Associates, and then at another point stated that her phone was not working so she was not able to receive calls.

At the time of the August 2016 report, Megan was making "poor" progress on the case. She was still having supervised visits with the three girls; Floyd was not yet born. Visits took place in a neutral location because there were concerns about having visits in Megan's home after La Rissa reported that she had to put away "a pipe" that had been left out. Visits had been reduced from four times each week to three times each week, but Megan's attendance remained inconsistent; she was missing about 25 percent of her visits (the court report shows that from March to July, Megan attended 67 out of 86 visits) and she was required to call and confirm her visits. There continued to be concerns about arguments between La Rissa and Megan, and about inappropriate conversations taking place during visits. Megan had still not completed dual-diagnosis treatment by the time of the hearing in September, and Megan was not submitting to UAs.

From September 2016 until Pickering left the case in November, Megan continued to have supervised visits with the children. Her attendance improved, and there were still some inappropriate conversations, but there were not as many concerns as before. Megan did not submit to any UAs from September to November. Pickering did not receive proof that Megan was participating in a sober support group.

During Pickering's time on the case, Megan had not fully and successfully completed dual-diagnosis treatment or attended AA or NA. She did not fully comply with UA testing and was discharged from services four times for noncompliance; Pickering testified that she always made sure that she had the correct phone number for Megan and provided that number to the testing agency, and when she found out that Megan needed to call to see if she was on the list to test, Pickering made sure that Megan had the information she needed to comply with that service. Exhibits received into evidence show that there were 84 unsuccessful attempts to drug test Megan from December 18, 2015, to December 13, 2016 (81 times the tests were missed or no contact was made with Megan, 3 times Megan was unable to produce a sample); there is no record of any completed drug tests during that same time period. Megan did not abstain from the use of drugs and alcohol. Megan did have housing, and was sometimes employed.

Pickering testified that it would be in the children's best interests to terminate Megan's parental rights because of the length of time the older children had been out-of-home, their need

for permanency, and Megan's failure to make progress. Pickering opined that Floyd would be at risk of harm if returned to Megan due to her lack of progress.

Megan testified that she had housing and was employed. She was currently doing outpatient substance abuse treatment at Capstone Behavioral Health since November 2016, attending both individual and group therapy. Megan had attended an AA support group "probably about one every other week." She had attended supervised visits during which she provided food, clothes, and activities. Megan loves her children and she believes she and her children "get along awesomely." She does not believe it is in the children's best interests to terminate her parental rights.

A December 16, 2016, letter from Capstone Behavioral Health, received into evidence as exhibit 47, states that Megan completed a substance abuse evaluation on November 9. She then began Level I outpatient treatment, which is a 14-week treatment program that includes both individual and group therapy. She attended individual therapy on November 30, December 7, and December 12, and she had attended five group therapy sessions as well.

Lindsay Denker is a dual-diagnosis therapist with Capstone Behavioral Health. She is also the director of drug testing, parenting time, and family support. Denker testified that she runs the "Level 1 group on Monday nights," and that Megan had been at the last five group sessions, the first of which was on November 14, 2016. Other than one session when Megan was "pretty quiet," she had been participating and doing well.

*Juvenile Court's Decision.*

In orders filed on December 22, 2016, the juvenile court found, by a preponderance of the evidence, that Floyd was a child within the meaning of § 43-247(3)(a). The juvenile court further found, by clear and convincing evidence, that grounds existed to terminate Megan's parental rights to La Rissa, Breanna, and Patience pursuant to § 43-292(6) and (7), and to all four children pursuant to § 43-292(2). Finally, the juvenile court found that termination was in all four of the children's best interests. Megan's parental rights were terminated accordingly. She has timely appealed the juvenile court's orders.

## ASSIGNMENTS OF ERROR

Megan assigns that the juvenile court erred in finding (1) the State proved by clear and convincing evidence that her parental rights should be terminated, and (2) that it was in the children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order, the juvenile court found, by clear and convincing evidence, that grounds existed to terminate Megan's parental rights to La Rissa, Breanna, and Patience pursuant to § 43-292(6) and (7), and to all four children pursuant to § 43-292(2). Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *Id*.

The three girls were removed from Megan's care after Patience tested positive for methamphetamine at the time of her birth in February 2015. Megan was ordered to enroll in dual-diagnosis outpatient treatment to address issues of substance abuse, follow after care recommendations, submit to random UAs, and not use alcohol and drugs. While she did participate in the Hero Program at the Stephen Center, she could not be successfully discharged until she attended 16 AA meetings, which she did not do because she was "too busy." In 2016, Megan did not submit to UAs as court-ordered. And from March to July, Megan missed more than 20 percent of her supervised visits. Furthermore, despite an ongoing juvenile case concerning her drug use, when Megan gave birth to Floyd in September 2016, he tested positive for methamphetamine. We find the record establishes, by clear and convincing evidence, that Megan substantially and continuously or repeatedly neglected to provide the children, or a sibling, necessary parental care and protection.

We need not consider whether termination of Megan's parental rights to the three girls was proper pursuant to § 43-292(6) or (7) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S.*, *supra*. Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests*.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Megan has failed to consistently and successfully comply with court-ordered services. The three girls were removed from Megan's care after Patience tested positive for methamphetamine at birth. Megan was ordered to enroll in dual-diagnosis outpatient treatment to address issues of substance abuse, follow after care recommendations, submit to random UAs, and not use alcohol and drugs. While she did participate in the Hero Program at the Stephen Center, she could not be successfully discharged until she attended 16 AA meetings, which she did not do. From December 18, 2015, to December 13, 2016, there were 84 unsuccessful attempts to drug test Megan (81 times the tests were missed or no contact was made with Megan, 3 times Megan was unable to produce a sample); there is no record of any completed drug tests during that same time period. And she was discharged from drug testing services four times for noncompliance. Furthermore, when Floyd was born in September 2016, he tested positive for methamphetamine.

In addition to concerns about Megan's drug use, there were concerns with her visitation. Megan never moved beyond supervised visitation. Moreover, she was not attending all of her visits. And during visits there were concerns about Megan having inappropriate conversations about the juvenile case.

From September to November 2016, Megan's visitation attendance had improved. And in November, the month before the termination hearing, Megan did complete a new substance abuse evaluation and began Level I outpatient treatment at Capstone Behavioral Health. While this is progress, Megan's efforts came after the State filed the petition to terminate her parental rights, and her recent efforts have been too little and come too late. See *In re Interest of Sir Messiah T. et al.*, *surpa* (terminating parental rights despite recent progress when efforts largely came after State filed petition to terminate). See, also, *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999) (last-minute attempts by parents to comply with rehabilitation plan do not prevent termination of parental rights).

Davidson testified that La Rissa and Breanna need permanency. And Pickering testified that it would be in the children's best interests to terminate Megan's parental rights because of the length of time the older children had been out-of-home, their need for permanency, and Megan's failure to make progress. At the time of the termination hearing, the three girls had been in an out-of-home placement for 22 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Pickering opined that Floyd would also be at risk of harm if

returned to Megan due to her lack of progress in the case. Based upon our de novo review of the record, we find clear and convincing evidence that Megan's deficiencies have prevented her from parenting the children in the past and would likely prevent her from doing so in the future. Accordingly, the presumption of parental fitness has been rebutted. We also find that termination of Megan's parental rights is in the children's best interests. We affirm the judgments terminating Megan's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court terminating Megan's parental rights to La Rissa, Breanna, Patience, and Floyd.

AFFIRMED.